[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
 INDEX OF POINTS
 I

 Whether the license granted to the plaintiff for the
 sanitary landfill was for the whole of Lot 9 or for
 the northern portion of it. Page 4
 II

 Whether the State's closure order of July 13, 1983
 resulted in an inverse condemnation of the southern
 portion of Lot 9. Page 19
 III

 Whether the plaintiff proved that the only reasonable
 and beneficial use of Lot 9 was as a sanitary landfill. Page 62
 IV

 Rulings deferred at trial. Page 91
 V

 Conclusion Page 93
 GIANNINI, P.J. (Ret.)
On May 8, 1984, this Court entered its judgment in a proceeding entitled Landfill Resource Recovery, Inc. v.Department of Environmental Management of the State of RhodeIsland, et al. C.A. No. 81-4091. The judgment stated:
 That the closure by the Defendant Department of Environmental Management of substantial portions of the landfill of plaintiff pursuant to R.I.G.L. § 23-18.9-8.2 (1979 Reenactment) is, as a matter of law, a compensable taking under R.I.G.L. § 37-6-1 et. seq. entitling the owner thereof to just compensation. Plaintiff is, therefore, entitled to commence a civil action in the Superior Court for just compensation.
Armed with that judgment, the plaintiff herein (or "LRR") instituted the instant action against the Department of Environmental Management of the State of Rhode Island, the State of Rhode Island itself and ten other defendants all of whom are or were public officers. Since this is a civil action brought essentially against the State of Rhode Island because of the conduct of an executive department, the Department of Environmental Management, the Court will refer to the defendants as "the State" or "DEM" or the "defendant." Echoing this Court's judgment, the relief sought by the complaint in the case at bar was "[a]warding LRR just compensation as a consequence of the closure of the premises for use as a landfill." But the life of the Court's 1984 determination was brief. Declaring error, our Supreme Court held that whether DEM's closure constituted a taking requiring payment of just compensation "is not a pure question of law but must be based upon an adequate factual predicate." (Cite omitted.) Landfill Resource Recovery, Inc.v. Department of Environmental Management of the State of RhodeIsland, 512 A.2d 866, 869 (R.I. 1986).
Following that opinion, the plaintiff amended its complaint. In its present form, the complaint alleges that the State's closure order has "deprived LRR of all or most of its interest in its property and constitute[s] an inverse condemnation within the meaning of the Fifth and Fourteenth Amendments of the United States Constitution and Article I § 16 of the Constitution of the State of Rhode Island" and "a de facto taking in that all reasonable and beneficial use of the affected property is denied to LRR to benefit the public welfare."
In 1974, LRR purchased a 53 acre parcel of land in the Town of North Smithfield which the Town's tax assessors had designated as Lot 9, 9A and 90 on Plat 7. (Exhibit 25) The deed of conveyance describes the parcel by metes and bounds. (Exhibit 3) The land is located north of the intersection of Pound Hill Road and Oxford Road, sometimes called Old Forge Road (Exhibit 7, p. 2.) and is intersected by a seasonal swale and a power line in an east-west direction. (Exhibit 10A) Great significance is attributed by the State to the division of this Lot into northern and southern areas because of the existence of the swale and power line.
The plaintiff was then in the business of picking up and disposing of trash and, prior to its purchase of the 53 acres, had used Lot 9 ("the Lot" or "the parcel") regularly as a landfill site. Upon becoming the owner, it continued to use the land as a landfill. Mr. Charles Wilson, the plaintiff's president, testified that while LRR owned the parcel there was no disposal of trash on the portion of the parcel southerly of the swale and power line. He testified, nonetheless, that in acquiring Lot 9 it was the plaintiff's intention that both the north and south portions were to be used as a landfill.
With the enactment of § 23-46-8 by Public Laws 1974, Chapter 176 (now § 23-18.9-8, G.L. 1956 (1989 Reenactment)), the plaintiff was obliged to obtain a license from the director of the Department of Health if it wished to continue to operate its solid waste management facility in North Smithfield. Such a license was issued to LRR by the director for a period of one year from December 1, 1976. (Exhibit 8) Similar annual licenses were issued by the director of DEM, to whom that authority has been transferred, including the year ending December 1, 1980. (Exhibit 8) The plaintiff's application for the renewal of its license for the year 1980-1981 resulted in a course of administrative and judicial litigation culminating on July 13, 1983 in this Court's approval of a "Consent Order and Agreement" (the "Agreement") executed by the plaintiff and the defendant. (Exhibit 19) Notwithstanding the lack of a renewal of its license, the plaintiff conducted business as usual on the northern section of Lot 9 until July 13, 1983, it being entitled to do so by law. The upshot of the agreement and its approval by the Court (the "Order") was that "the southern part of the site [is] closed and forever barred from use as a landfill." (Exhibit 19, para. 14) The agreement further provided that "LRR may continue to operate its solid waste disposal facility (`landfill') on the northern part of its site for a period not to exceed eighteen (18) months. . . ." (Exhibit 19, para. 1)
The plaintiff takes no issue with the State about its agreement for the eventual cessation of landfill operations in the northern sector but maintains that the State's action in prohibiting future activities in the southern sector constitutes a taking of property which is constitutionally and statutorily compensable. It is for that reason that this suit has been begun. As one might surmise, it will be necessary for the Court to enlarge upon the foregoing summary which the Court has provided for a preliminary understanding on how these parties came to this place.
The State has mounted a number of arguments either to defeat or to minimize the plaintiff's claim for just compensation. Logically and pragmatically, the State asserts as its first proposition that LRR has failed to prove that the southern portion of Lot 9 was a part of a licensed solid waste management facility when it was ordered closed on July 13, 1983. The first question which the Court must answer, then, is: What did the plaintiff get in December 1976, when it received from the director of health a license to operate a solid waste management facility?
I
In order to obtain its license and in order for the director to be able to issue it, the plaintiff was bound to meet the provisions of "Rules and Regulations for Licensing Solid Waste Management Facilities Effective 11 December 1975." (Exhibit 33B) Pointing to paragraphs 2.08 and 2.09 of those rules, the State avers that the director was denied the authority to award a license in 1976 which would have included permission to use the southern area as a landfill. The implicit argument is that since the director is presumed not to have violated his legal duty, the licenses which were issued in 1976 and thereafter were for the northern area alone. It is the State's view that the presence of the power line easement and the swale, or watercourse as the State refers to it, which runs across Lot 9, divide the parcel of land into two separate geographical areas, one in the north which enjoyed the license and one in the south to which the license was never applicable. It is pointed out that a separate license was required for each separate area by the provision of paragraph 2.09(a) of the rules (Exhibit 33B) which says:
 Separate licenses shall be required for solid waste management facilities which are located in separate geographical areas even though they are under the same management.
Hence, it is argued that even if the plaintiff's 1976 application is construed to be for licensure of the entire parcel of land, this rule would prevent the director from granting it.
A
The defendant appears to have little quarrel with the plaintiff's evidence that it was always LRR's intention to use the southern area as a landfill at some future time. It argues further, however, that because LRR concedes that it was not using the southern portion as a landfill when the 1976 license was applied for, paragraph 2.08 prohibited "`anticipated' licensing." Paragraph 2.08 provides:
 Approval For New Areas and/or Services. — The license shall apply only to the solid waste management facility operating at the time the license is issued. Additional areas or services shall be subject to the approval of the licensing agency and requirements of licensure.
It appears to the Court that these two arguments must be taken to be inter-related, viz., (a) Lot 9 is geographically separated into two parts by a natural (the watercourse) and an artificial (the easement) boundary; (b) at the time the license issued, only the northern part was being operated as a solid waste management facility.
While the Court concurs that the director had no power to issue a single license for geographically separated areas, it does not follow that he violated his legal duty if he licensed the whole of LRR's parcel as a sanitary landfill. Presuming again that our public officials obey the law in their administration of the State's affairs, the licensing of all of the land would carry with it the implication that he did not consider the lot to be geographically separated at all but determined that all of Lot 9 was to be treated as a landfill facility.
B
The evidence shows that in 1974 the plaintiff had been dumping trash, which it had been collecting outside of North Smithfield, on Lot 9 and continued to do so after it became the owner of the land. For the first six months of that year and before, that activity was not regulated by the State. The need for a license to conduct a business such as the plaintiff's did not arise until July 1, 1974 when chapter 176, supra, became effective. It was more than a year after that effective date that LRR was called upon to apply for its license. (Exhibit 62)
Exhibit 62 is a letter to the plaintiff dated December 16, 1975. Its author is Mr. Frank B. Stevenson, then senior engineer in the Division of Solid Waste Management of the Department of Health. The letter reminds the plaintiff that "a copy of the Health Department's new licensing regulations for solid waste management facilities was mailed" to the plaintiff on November 24, 1975. It informs "that all existing solid waste management facilities be licensed on or before 11 December 1976, one year after the effective date of the regulations." It set June 11, 1976 as the date "that applications for existing facilities be submitted." It invited the plaintiff to "select an engineer to produce the required plans and have this engineer contact [Stevenson] as soon as possible to arrange a meeting to discuss these regulations." The regulations referred to in the letter are Exhibit 33B. Stevenson testified in this matter that he was the principal author of them.
On January 28, 1976, Stevenson addressed a letter to Charles Wilson. The body of the letter reads:
 Enclosed are two copies of Application For A License To Operate A Solid Waste Management Facility. Application number LA 14-76 is for North Smithfield and application number LA 15-76 is for Warwick.
 Please complete the top section of both forms and return it with the U.S.G.S. maps as indicated in the regulations. This will allow us time to begin the initial investigation for each site. (Exhibit 63)
Application number LA 14-76 which was sent to Wilson is Exhibit 4. It permitted LRR to seek a license for any of five types of solid waste management facilities, three of which are defined in Rule 1 of Exhibit 33B and the remaining two are self-descriptive. By its application, the plaintiff told the Department of Health that it was seeking a license for a sanitary landfill. This was a shorthand method of telling the department that it wanted a license for "a land disposal site employing an engineered method of disposal of solid waste in a manner that minimizes environmental hazards including spreading the solid waste in thin layers, compacting the solid waste to the smallest practical volume and applying cover material at the end of each operating day or at such more frequent intervals as may be necessary." (Rule 1.28; Exhibit 33B)
Rule 2.03(c) of Exhibit 33B tells an applicant for any of the five solid waste management facility licenses that plans and specifications are required to be submitted with the application. Among the items which the plaintiff had to provide the department with respect to its intentions in the operation of its sanitary landfill were a site plan (rule 2.03(c)(1)1.4), typical cross section plans (rule 2.03(c)(1)1.5) and an operating plan (rule 2.03(c)(1)4). This last rule required the disclosure of the method of operation of the sanitary landfill for the ensuing two year period and for the submission of a new operating plan at the end of every two years. Complying with these directives, LRR sent to the department a site plan (Exhibit 10B), cross section plans (Exhibit 10C) and an operating plan (Exhibit 7). Exhibits 10B and 10C told the department in graphic terms that the part of Lot 9 south of the seasonal storm swale was going to be used as a sanitary landfill. The plaintiff was more specific in Exhibit 7, its operating plan. It said that it intended to fill the northern portion first and that when that area was filled to capacity it would move into the southern part and fill it. (Exhibit 7, p. 6)
At a minimum, this application and these documents expressed the plaintiff's clear intention that, if the department granted its license, the solid waste management facility would consist of the real property represented by the radius plan it submitted, Exhibit 41. This is what the plaintiff sought; it was not what it was entitled to as a matter of right. The State could have responded by deciding that the seasonal swale and the power line easement divided the lot into two geographical areas and granted a license limiting the sanitary landfill operation to the north portion. Such a determination might well have resulted in a final judgment deciding whether the State's present position is right or wrong. But the defendant did not take that course. It issued a license to LRR "to operate a sanitary landfill, solid waste management facility . . . located on Oxford Road in North Smithfield." The issuance of the license in this form, without restriction, moves the Court to find, in answer to the question it previously posed, that in December 1976 the plaintiff was given a license to operate its business on all of Lot 9, the southern part included.
The States makes the point, conceded by the plaintiff, that no trash was ever dumped on the southern portion. The argument has no more validity than it would have if the plaintiff's operating plan had been to use the northern portion in 1976-1977 and the southern portion in 1977-1978 and, before it used the southern portion in 1977, the State closed it by a consent order dated July 13, 1977.
C
Mr. Stevenson testified that it was his responsibility to determine whether an application was complete. He used a check list in order to do this. The "License Worksheet" he used to check against the plaintiff's application is Exhibit 59. Having done that, it was his job to recommend to the department director whether the application for a license should be granted or not. He said he knew that a license was not available for two separate geographical areas but determined the outer limit of the site of LRR's landfill operation to be the entirety of Lot 9. Since Stevenson had a major hand in drafting the rules and regulations (Exhibit 33B), he knew that the meaning of the words "solid waste management facility" included "real . . . property . . . operated for the purpose of . . . disposing of solid wastes. . . ." (Rule 1.33) His testimony about the outer limit of the site followed from the conduct of the parties: he sent out an application on January 28, 1976 (Exhibit 4) which asked, in effect, which land did LRR wish to have licensed as a solid waste management facility and LRR answered "Lot 9." He could have recommended to the director that a license issue to cover only the northern section if he viewed the southern section "as a distinct" part of the facility which, he could have said further, he "identified as a separate unit" (see rule 2.09(b)). In addition, he was authorized to use rule 2.08 and maintain that the northern site was the only solid waste management facility operating at the time. His testimony made it plain that he was fully aware of rule 2.08 but nonetheless concluded from the original set of operating plans that the southern portion, as well as the northern, was proposed to be used as a landfill. As a result, the director granted a license which could not have been broader in scope or effect.
Until his departure from DEM in 1986, Stevenson continued to have responsibilities involving licensure of solid waste management facilities. He had a role in the amendment of the rules and regulations which became effective December 1, 1982, Exhibit 34. He progressed from the position of senior engineer in the Health Department to the position of supervising sanitary engineer in DEM. When he testified, he was employed with a Massachusetts engineering firm.
Stevenson testified in the plaintiff's case-in-chief and in rebuttal. It came to light that Wilson and DEM had been involved in the siting of a landfill in the Town of Richmond and that, after his departure from state service, Stevenson testified as an expert witness in that proceeding on Wilson's behalf. He gave his testimony in this case under circumstances which strike the Court as paradoxical. He had been subpoenaed and thereby had an obligation to attend and to testify with respect to facts within his knowledge as to events which occurred while he held his state position. In that regard he is to be looked upon as a fact witness and not as an expert. Yet he was to be paid for the time he spent testifying at what he characterized as the "usual hourly rate." His responses in an area of cross-examination left the Court with the impression that they lacked complete objectivity but were phrased in a manner which would not be detrimental to LRR's cause. There is, nonetheless, objective evidence that his testimony that he considered the license to cover the whole of Lot 9 is true.
D
Long before he testified to that effect, namely, when he received the plaintiff's first application in February, 1976, he wrote identical memoranda to the director of the Department of Natural Resources (Exhibit 5) and to Robert B. Russ, the general manager of the Water Resources Board (Exhibit 6). He informed each of them that the plaintiff's application had been received and that it pertained to a site which "happens to be an existing facility." He went on to say, "The possibility exists that the proposal would include expansion of the current site into previously unfilled areas." The Court reads that sentence to mean that Stevenson knew what the existing operation was at the site and that it was possible for a license to be issued to include the areas where no dumping was then being carried on.
A month later, Stevenson sent a letter to the plaintiff to which he attached a copy of the response he had received from the Water Resources Board. The response reveals that the Board's comments treated the "North Smithfield Sanitary Landfill" as a parcel of land containing 36 acres, the entirety of Lot 9. (Exhibit 56) More probably than not, that information was provided by Stevenson through LRR's submissions. Whether that is so or not, if the Board's understanding was in error one would expect that Stevenson would have corrected it.
Years after Stevenson recommended that LRR be given its first license and years before he testified in this case, he expressed himself under oath in a manner that permits a reasonable inference that it was his belief that the plaintiff's licenses covered all of Lot 9.
In December, 1981, Stevenson executed an affidavit for use in litigation then pending. The litigation involved an appeal to this Court under the Administrative Procedures Act. The parties to that proceeding were this plaintiff and the then incumbent director of DEM. The affidavit discloses that he was testifying as the principal sanitary engineer of hazardous and solid waste programs in DEM and in support of an order entered by a DEM hearing officer, Mr. Frank Geremia, which was adverse to LRR. In paragraph 11 of the affidavit, he stated as his expert opinion that "the Order provision requiring immediate and permanent cessation of disposal in the northern section of the landfill are reasonable and necessary." In paragraph 16, he opined: "The northern section of the facility should be immediately closed out. . . ." (Exhibit 61) From these statements, the Court finds inescapable the conclusion that, as the state official responsible to recommend to the director the breadth of the plaintiff's license, the State looked upon Lot 9 as a solitary landfill facility having northern and southern sections.
E
In an effort to demonstrate that no license had ever been granted for the southern area, the State elicited from Stevenson that LRR had never submitted a map or a narrative, with any of its applications, which showed where dumping in the southern portion would begin; the location of any gate or road which would provide access to the south; any contemplated work for a road linking the northern and southern parts or any provision in the southern part for an emergency facility for workers. Stevenson also reported that he was not aware of any proposed building construction to the south. It was also pointed out that the plaintiff had submitted grid systems which demonstrated that all filling was projected for the northern area alone.
There appear to be at least two answers in the evidence to the defendant's approach. The first is that it was the defendant itself which required the plaintiff to limit its operational plan to a two year period. Even in 1980 when the plaintiff's renewal application resulted in a hearing and, as things turned out thereafter, the eventual shutdown of the entire operation, the two year operational plan manifested that the total area, as of June 16, 1980, which had reached roughly two year finish grade elevation was three acres. (Exhibit 15) Having told LRR to confine its planning to a two year span, it seems rather ungracious for the State now to make an issue of the fact that the plaintiff was not more specific about its plans for the southern part other than to say that it would be used eventually.
The grid system, Stevenson said, was not required by the 1975 rules and regulations. The plaintiff provided the grid system at his request in order to facilitate discussion about the sequence of operation. When LRR revised Exhibit 7 on November 10, 1977 with regard to its proposed sequence of dumping (Exhibit L) it restated its intention to fill the southern part. That restatement was omitted in the operating plan forwarded with its renewal application in 1980. (Exhibit 15) The Court has no doubt, however, given the evidence of what transpired thereafter, that the State regarded LRR as the licensee of a landfill business on Lot 9.
One need go no further than consider the "Decision and Order" entered by the director of DEM following a hearing before hearing Officer Geremia. (Exhibit 38) That hearing was the product of the plaintiff's 1980 application to renew its license. The hearing was conducted at the director's order. (Exhibit 37) The director left no doubt about what was of concern to the State because the very first sentence of the decision says, "This is a license renewal matter involving the continued operation of a solid waste management facility." He was cognizant of his duty to renew the license unless he established "cause" to deny it. (Exhibit 38, p. 13) At the conclusion of the hearing, he ordered the plaintiff to "cease the disposal of solid waste north of the so-called seasonal drainage swale which nearly coincides with a power line easement." (Exhibit 38, p. 18) He assured LRR that the "closure plan should concern itself solely with the area north of the drainage swale. (Exhibit 38, p. 19) Finally, he ordered the issuance of "a landfill operating license renewal to LRR for the operation of a solid waste disposal facility to be operated "solely" south of the drainage swale. (Exhibit 38, p. 20) In light of the position taken by the State in the instant proceeding, it may be of some benefit for the Court to point out by paraphrase that the director did not say to the applicant-plaintiff, "The State gave you a license to operate north of the swale; that license will not be renewed and your application is denied. You may apply for a license to operate south of the swale." The director's decision is interpreted by the Court to say, "The State gave you a license to operate on Lot 9. Your application to renew is denied as to your operation north of the swale but it is granted for you to operate south of the swale." What is to be gleaned from the State's "Decision and Order" is that the plaintiff was not granted a new license to operate to the south but had its license renewed with the proviso that there could be no more dumping to the north. It appears to the Court to be a virtual certainty that, if LRR had been granted a license for only the northerly portion as the State contends, the director could not have ordered a license to issue for the southerly portion on the basis of the 1980 application. This must be so because the 1980 application would have to have been regarded as being limited to the northerly area. Since the director's decision amounts to a denial of the application in respect to the northerly part, a new and separate license application for the southerly part would have had to follow. In short, if a license existed for only the northern part and renewal of it was denied, the director would have had no authority to order a license to issue for a landfill operation on the southern part without a new application for such an operation.
F
One of the witnesses in this trial was Mr. Robert L. Bendick, Jr., the then incumbent director of DEM. He came to that position in 1982 after having served as DEM's assistant director for administration since 1978. He testified with respect to the degree of his delegation of authority as director to his subordinates and of his chain of command. During his administration, that chain would not have permitted Stevenson to advise or make a recommendation to him directly. Anything Stevenson had to say would come up through channels and to the division chiefs. He said he was aware of his predecessor's policy which he considered no different than his own. He stated that he was not aware of any delegation by his predecessor which permitted anyone to issue licenses between 1978 and 1982. It was his belief that the licenses granted to LRR did not apply to the southern portion of LRR's land at the time of its closure on July 13, 1983.
Bendick's testimony has very little, if any, probative value. He was not in a position to know to what extent Stevenson may have been delegated duties by the director of the Health Department in 1975 and 1976. It goes without saying that, irrespective of the breadth of discretion reposed in Stevenson by that director, the director was the sole individual empowered by law to issue a license for a sanitary landfill. The same is true as to Bendick's predecessor at DEM. How that predecessor came to his decision to issue three licenses to the plaintiff is beside the point. The fact is that he did and the evidence is that every license that the State issued through his predecessor was identical in scope with the first licensed issued in 1976. (Exhibit 8)
Bendick's belief that only the northern portion of Lot 9 had the benefit of the license runs counter to his actions. To begin with, the statutory power be exercised on July 13, 1983 could be utilized only "[w]here an existing solid waste management facility-landfill overlies the groundwater reservoir or groundwater recharge area designated by the [Town of North Smithfield]." (§ 23-18.9-9(e)) If, on July 13, 1983, there was no "existing solid waste management facility-landfill" in the southern portion of Lot 9, Bendick's closure order was an unnecessary exercise. It is not reasonable to infer that he engaged in useless exercises.
In addition, Bendick had a role in negotiating the agreement of July 13, 1983 (Exhibit 19) with his department's attorneys, LRR's representatives and its attorneys. In some cases he took part in selecting language to be included in that agreement. And, of course, he executed the agreement on behalf of the State. He thereby bound the State to its terms. By those terms, the State permitted the plaintiff to continue its landfilling operation in the northern portion for a period not exceeding eighteen months and ordered "the southern part of the site closed and forever barred from use as a landfill." (Exhibit 19, para. 1 and 14) Had there been no license covering the southern part, there would have been no need to close it and prohibit its use as a landfill. Had there been no license covering the southern part, any use of that area by LRR would have been in violation of law. It is not reasonable to suggest that the quoted language was included in the agreement to prevent LRR from doing something it was not permitted to do without a license. That language can mean only that the plaintiff was being deprived of the license which it had up to that time to dump on the southern part of its land.
The director could not have misinterpreted that language. A part of the agreement were Exhibits 20B and 20C. The Court, with its own insertions, reads note 3 of the "Legend" on those exhibits to say: "The temporary haul road is only to bring cover material to be excavated from the south side of the [landfill] site to the operational portions of the landfill [site]." Here LRR and the State are using the words "landfill" and "site" synonymously which, again reaffirms the State's understanding, until this case, that the landfill which it licensed had northern and southern parts to it.
The State advances the point that if Lot 9 was licensed in its entirety, the license had lapsed by July 13, 1983. This is said to be so because the last application was filed in November, 1980. There is no merit whatsoever to this argument. LRR's application had been timely filed. Instead of granting or denying it, the director ordered a hearing. The applicant was entitled by law to continue with its business at the landfill site until it received or was refused a license to continue. The plaintiff was so informed by the director. (Exhibit 37) What began as a hearing in 1981 ended with the agreement of July 13, 1983.
It is the Court's finding on this issue, therefore, that on July 13, 1983 LRR was then the holder of a license (Exhibit 8) issued by the defendant permitting it to operate a sanitary landfill, solid waste management facility, on the whole of Lot 9 on tax assessors' plat 7 in the Town of North Smithfield. By virtue of the agreement of the parties to this proceeding and the approval of that agreement by this Court on that day, the application for the renewal of that license which the plaintiff had filed in 1980 was denied. In practical terms, the agreement and order prevented the plaintiff immediately from engaging in the business of dumping trash on the southern portion of Lot 9. For the denial of that right, the plaintiff wants the State to pay "just compensation."
II
The premise for that claim is summarily set out in the plaintiff's Post Trial Memorandum:
 * * * [D]id the closure order work a "taking" under the law of inverse condemnation, or did valuable uses for the property remain? If there was a taking, what was the amount of the loss — the increase in value? [119]
 * * *
 Paragraph 14 of the 1983 order closed the southern area "as an existing solid waste management facility-landfill;" there was no other reasonable and beneficial use remaining; we have shown by a preponderance of the evidence that the Order effected a taking according to the law of inverse condemnation. [61]
A
These references to inverse condemnation prompt the Court to digress from this decision sufficiently long to look at the statute which was the director's authority to close the plaintiff's landfill. The 1982 administrative hearing notice (Exhibit 39) which initiated the process cited § 23-18.9-8.2. Today that section is designated as § 23-18.9-9.1. The act provides that if "the decision of the director of environmental management constitutes a taking under chapter 6 of title 37" an aggrieved party "shall be entitled to petition the superior court to recover just compensation therefor."
If the matter at bar were predicated on chapter 6 of title 37, as it evidently is not, the plaintiff must surely fail. That statute leaves little, if anything, to be resolved on the issue of "taking" because its structure calls for an interest in land to be acquired by the condemnor leaving the condemnee with a right to just compensation for the interest acquired. Our Supreme Court took pains to make the distinction in Landfill ResourceRecovery, supra, when it said that this plaintiff would be pursuing "a claim that the closure of the site was in effect
a taking of its property pursuant to . . . chapter 6 of title 37" [867] and that § 23-18.9-9.1 "provided a specific procedure for responding to a de facto condemnation by [the] order of closure." [869] (Emphasis added)
That language is certainly in keeping with the court's earlier description of the term "inverse condemnation" as "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency" citing Ferguson v. Keene, 108 N.H. 409, 238 A.2d 1 (1968). E J Inc. v. Redevelopment Agency of Woonsocket, 122 R.I. 288, 290 (n. 1) (1979).
In accord with this expression is the distinction made inAgins v. City of Tiburon, 447 U.S. 255, 258 (n. 2) (1980):
 Inverse condemnation should be distinguished from eminent domain. Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property. Inverse condemnation is a "shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted. (Citations omitted.)
In the case at bar, the State has not utilized the formal proceedings prescribed in chapter 6 of title 37 and the fee interest in Lot 9 remains intact in the plaintiff. The absence of these statutory formalities requires the conclusion that the action of the director of environmental management in bringing an end to the use of that parcel as a landfill does not constitute a "taking" within the meaning of § 23-18.9-9.1.
B
The plaintiff argues that the State expressed its intention to take well before the closure order was settled upon. At 94 of its Post Trial Memorandum the following is told to the Court:
 Remember that the 1983 Closure order was preceded in September, 1982, by DEM's written notice to LRR that a hearing would be held to pursue closure under the 208 Act [Ex. 39]. (Emphasis in the original.)
 * * *
 It is pretty basic doctrine in the condemnation field that the government, trying to reduce a property's appraisal value at the date of taking, cannot take advantage of the effect of the government's own actions after the intention to take had been announced.
And at 97:
 It would be a bitter irony for the state to be successful in a trial tactic whose lynchpin is the effect of the new regulations, passed after the notice of taking had been issued, which had never been applied to the site and played no part in its closure.
There is nothing in the evidence in this case, least of all in Exhibit 39, which would permit a finding that the State demonstrated an intention to take the plaintiff's property. Exhibit 39 is the administrative hearing notice sent to the plaintiff which contains within the caption of the case the description of the matter. That description reads: "Hearing to determine whether Landfill Resource Recovery, Inc. presents a hazard to a public drinking water source." The notice concludes with these two paragraphs:
 Thus the principle [sic] issue at this hearing is whether LRR's continued operation does present a hazard to the above described public drinking water source in the Town of North Smithfield.
 In the event the Director determines that the continued operation of the landfill does present a hazard to the public drinking water source, the Director is authorized to order cessation of solid waste disposal operations and closure of said landfill. Therefore, the hearing will also address the issue of conditions and requirements of any necessary closure.
As the Court reads Exhibit 39, the notice did no more nor less than fully inform the plaintiff that its license might or might not be renewed. Neither its terminology, nor any other evidence brought to the Court's attention, presents a broader question than: should LRR be permitted to continue its operation or not? That the hearing brought an eventual halt to the plaintiff's business does not transform the administrative notice into a "notice of taking."
C
LRR contends additionally that the conduct of the State in depriving it of its license had no less an effect upon its land than had the defendant exercised its power of eminent domain. In terms much more succinct, the plaintiff presents its salient point that it has met its "overall burden of convincing a reasonable trier of fact that, but for the taking, the property would have had a reasonable and beneficial use — in this case as a landfill." [Post Trial Memorandum 101] Otherwise phrased, had the director not taken away its license, the plaintiff could have operated its landfill business on the southern portion of Lot 9.
The defendant's response — as simple as it is complex — is that on July 13, 1983 the use of the southerly part of Lot 9 as a sanitary landfill was prohibited by the Town of North Smithfield. The State argues that if, on July 13, 1983, the plaintiff's license had been in full force and effect and the northern portion had been filled to capacity, the plaintiff could not on that date have begun to dump southerly because the North Smithfield Zoning Ordinance prohibited that type of use.
What the State is saying is that the closure order of July 13, 1983 did not effectuate a taking by it at all because the North Smithfield Zoning Ordinance would not have permitted the southern part of the Lot to be used for a landfill anyway. Hence, says the State implicitly, if there has been an inverse condemnation, it has been accomplished by the Town of North Smithfield and not by the State.
The plaintiff's initial retort is:
 If any part of the site's use would have been illegal, it was the state's burden to prove it . . . [I]t was not the plaintiff's burden to "check off" every civil and criminal law on the state and federal books. We didn't have to prove that the securities laws had been honored; that our trucks had been inspected and registered; or that our employees were being paid at least "minimum wage." If the state believed the landfill operation would have been unlawful, it was the state's burden to prove which of the nation's thousands of laws would have been violated. [Post Trial Memorandum 101]
In United States v. 320 Acres of land, 605 F.2d 762 (5th Cir. 1979) the Government exercised its power of eminent domain to condemn land and buildings for the Everglades National Park in Florida. At the trial below, the district judge excluded evidence that at the time of the taking the land had been improved by structures, i.e., cabins. The trial court reasoned that the existing structures were illegal uses and that before the condemnee could introduce evidence of their existence, it had to prove that the structures had been legally erected under a proper permit. In urging, in the case at bar, that the State has the burden to prove that the use of the southern part of Lot 9 for landfill purposes is barred by law, the plaintiff points to the following language of the Fifth Circuit appearing at 821:
 Given that the current record is almost devoid of relevant evidence, we can provide only limited guidance as to how the [cabins] should be valued upon remand.
 * * *
 If . . . the cabins were, at the time of the taking, illegal uses, the issue of just compensation is much more complex than the rulings below would suggest. As a preliminary matter, it is the Government's burden to prove that an existing structure is unlawful and therefore should not, as a matter of public policy, be compensated. Only if the Government proves that a permit or variance was required at the time the structure was erected does it become incumbent upon the landowner to prove that the structure was built legally with a valid permit. (Emphasis by the circuit court.)
It is clear from the circuit opinion that the trial court's ruling that the cabins were present illegally on the condemned property prevented the jury from giving full evaluation of the the "highest and best use" of the property. That ruling was squarely at issue upon appeal. What is far from clear is whether the circuit had before it the issue of the burden of persuasion. The opinion as a whole does not lend itself to the conclusion that the quoted passages represent the court's holding on an issue raised below regarding the burden of proof. The cited language itself suggests that the circuit was lending its "limited guidance" for the re-trial; surely an effort on the part of the circuit to minimize future trial court error. In addition, the court's choice of the words "burden to prove" and "to prove" makes it impossible to know whether the Government had been allocated the burden of persuasion on the question of illegality or whether it had the lesser burden of going forward with such evidence, leaving the landowners with the ultimate burden of persuading the trier of fact that the cabins were legally on the premises.
There is much in the Fifth Circuit opinion which is said with articulateness. There can be no uncertainty from the quoted passage, for instance, that in the instant proceeding LRR was required to say no more than that the highest and best use for the southern part of Lot 9 is a landfill. Having done that, if the State then "proves" that such use is not a permitted one it then "become[s] incumbent upon the landowner to prove" its legality. Id. at 821. Ambiguities aside, whether the excerpt proffered by LRR from 320 Acres of Land represents the court's holding or whether it is of hortative nature is of little practical significance. Whether the State's burden is of persuasion or of production has been resolved by the parties themselves by their Stipulation of Fact 40. There they agree that: "Under the Zoning Ordinance enacted in 1973, operation of a sanitary landfill was not a permitted use in an REA zone, and was permitted in an RA zone only with a special exception." When this agreed fact is coupled with evidence in this case which shows that the part of Lot 9 which the plaintiff had planned to use as a sanitary landfill lies entirely in an REA use zone, the State proved beyond doubt that the plaintiff's intended "highest and best use" is a prohibited use under the terms of the Zoning Ordinance of the Town of North Smithfield. Consequently, unless the plaintiff has proved that, in spite of the Zoning Ordinance, it had a legal basis which would have permitted it to dump in the southern area, the conclusion must follow that the plaintiff has been deprived of that use by the Town of North Smithfield and not by the State.
D
The Court's conclusion is not warranted, according to the plaintiff, because in spite of the prohibition of the Zoning Ordinance, the plaintiff was lawfully entitled to use the southern area of Lot 9 as a landfill inasmuch as the entirety of that Lot had the benefit of a non-conforming use preserved by that ordinance. The plaintiff's reliance upon that regulation, "grandfather rights" so-called, has an eclectic basis.
Some of the history of Lot 9 has been provided in the plaintiff's case by Exhibit 55. It is an affidavit executed by Mr. Harvey F. Fortune on September 1, 1976. He there asserts that in April 1959 and for several years before then trash, rubbish and other solid waste was trucked to and deposited on Lot 9. On September 18, 1969 the land was sold to Landfill, Inc., a corporation of which Fortune was the president. Landfill, Inc. conducted a landfill operation on the Lot, receiving and depositing municipal, commercial and industrial waste. Landfill, Inc. sold the land to the plaintiff on August 28, 1974. To Fortune's knowledge, Lot 9 has been "used as a landfill operation since the 1950's [sic] to and including the present date." He goes on to say, on information and belief, that Lot 9 has been used as a landfill site without interruption since 1927.
On September 2, 1969, sixteen days before Landfill, Inc. is purported to have acquired title to Lot 9, the Town of North Smithfield entered into an agreement which was executed by Fortune. The terms of the agreement are set out in Exhibit 53. Although as originally prepared the agreement designated Fortune as the other contracting party, called him "the Contractor" and occasionally referred to the contractor as "he", reference to Exhibit 53 shows that his name was crossed out and the name "Landfill, Inc." was handwritten above it. Even though there is no evidence that Landfill, Inc. was in existence on September 2, 1969, the Court will proceed as if the Town's intention was to contract with either Fortune or his nominee or principal.
The thrust of the agreement was that the contractor would "construct, operate and maintain a refuse disposal facility known as a sanitary landfill facility. . . ." Two sections of Exhibit 53 are:
 4. The Contractor covenants that he will own property by September [illegible], to be operated as a landfill operation or he shall furnish a statement by September [illegible], 1969 by the owner that his land can be used for a landfill operation under this contract during the period of this contract and any renewal thereof. The Contractor covenants that a sanitary landfill method will be used and that the operation will be in accordance with State regulations for sanitary landfill as set forth in Exhibit A.
 5. The Contractor agrees to furnish the Town with a map showing the exact location of the landfill operation which he intends to use during the term of this agreement.
In keeping with the terms of the agreement, the parties appended to it "Exhibit A" and "Exhibit B." Also attached to Exhibit 53 is a drawing of a land area described as Lot 9.
Three years later, on September 2, 1972, Landfill, Inc. and the Town executed another agreement, in evidence as Exhibit 54, which is virtually identical with Exhibit 53. Attached to Exhibit 54 are reproductions of the "Exhibit A", "Exhibit B" and the drawing of Lot 9 which accompanied the 1969 agreement.
In further proof of its contention that it has established its right to a non-conforming use for the entirety of Lot 9, the plaintiff shows that during the time that its application for a license was pending in 1976, Stevenson wrote to the plaintiff seeking information about the zoning status of Lot 9. The letter of July 15, 1976, Exhibit 65, reads in relevant part:
 As you are aware from previous correspondence, our legal department has instructed us that we may not issue a license to any sanitary landfill located in areas where the zoning does not specifically permit sanitary landfilling. We would appreciate receiving any information on the zoning of the area including copies of all applicable zoning laws so that we may obtain a decision from our legal department concerning this question.
Stevenson explained that Mr. Anthony DelGiudice, then chief legal counsel to the Health Department's legal division, instructed him "to obtain from each applicant for a license for a solid management facility [sic] documentation on the acceptability of the use of the property as far as local zoning is concerned." [Rebutal; 11/3/89 a.m.]
The next link in this chain of evidence are two communications from DelGiudice. On November 4, 1976, he sent a letter, Exhibit 46, to John D. Lynch, Esquire, which says:
 I have examined the affidavit submitted by Harvey F. Fortune, Jr. with respect to the use of the landfill site as a solid waste disposal facility from the years 1944 to date. Based on that information I have forwarded an inter-office memorandum to John S. Quinn, Jr., Chief of the Division of Solid Waste Management for the Department of Health, a copy of which is enclosed for your use and information. It is my opinion that that landfill site meets all of the zoning requirements and that zoning would no longer appear to be an impediment to licensure.
On November 4, 1976, John D. Lynch was an attorney representing LRR in matters connected with its pending application before the Health Department for a license to operate a landfill on the property in North Smithfield. (Stipulation of Fact 46) On November 4, 1976, DelGiudice wrote to Quinn about the North Smithfield landfill site: "Copies of documents received re the above-named property seem to indicate its compliance with zoning requirements." (Exhibit 47) Exhibit 59, Stevenson's worksheet, contains a notation "Zoning" against which he placed a checkmark and the words "OK Del."
Finally in this evidentiary area is Exhibit 58, a letter dated May 1, 1979, which was written to the plaintiff by Maurice Bourget who was then the building and zoning official of the Town of North Smithfield. He wrote:
 It has come to my attention that you may now be accepting hazardous liquid waste in addition to the allowed refuse listed in the original contract. The landfill operation was created pursuant to a contract with the Town in 1970. It became a pre-existing non-conforming use with the passage of a substantially revised 1973 Zoning Ordinance. Pursuant to this ordinance, burrying [sic] the hazardous liquids and hazardous solids constitutes a change of use. Only the North Smithfield Zoning Board of Review may authorize such a change of use.
 You are hereby directed to cease accepting any further hazardous or toxic wastes at this facility without first obtaining approval from the Zoning Board of Review of the Town of North Smithfield.
The marshalling of these facts evokes arguments by the plaintiff which the Court attempts to synopsize: Lot 9 earned grandfather rights before 1969 and either the entire Lot had these rights or none of it did; LRR's plan to dump on both the RA and REA zones received the State's approval since the first application in 1976; when this Court approved the consent order, it approved dumping in the REA zone; the first license was not issued until the State's attorney assured LRR that the zoning issue had been resolved in plaintiff's favor. As to this last point, plaintiff querys, "What is the purpose of a legal opinion given by a State lawyer to a license applicant, certifying that an impediment has been removed and inducing the licensee to act accordingly, if thirteen years later another State lawyer can claim the same impediment was a bar to the same activity?" [Post Trial Memorandum 57]
E
Ignoring the fact that the DelGiudice opinion could lawfully be directed only to the Department of Health and not to the licensee, which had no right to an opinion from a State-employed attorney, what must be said immediately is that the opinion did not induce the licensee to do anything. According to Charles Wilson, LRR had been dumping trash on Lot 9 for more than two years before it received DelGiudice's opinion and its first license from the State. If DelGiudice's conclusion did anything at all, one might say it resolved somebody's concern about the zoning status of the parcel because, as will be recounted, it seemed to pose no problem to the one individual who had the responsibility of checking on the plaintiff's eligibility to receive its first license — Frank Stevenson.
How it became necessary for a State lawyer to give an opinion that an impediment to zoning had been "removed" is not explained by the evidence. Nor does the evidence describe the impediment removed. However, in his letter to Lynch, DelGiudice makes reference to "the affidavit submitted by Harvey F. Fortune, Jr." and one might suppose that when DelGiudice says that the "landfill site meets all of the zoning requirements" he is relying on a statement in the affidavit that the site had been used as a landfill since 1944. There is an intimation here that a legal non-conforming use was attached to the site. Yet, when DelGiudice wrote to Quinn he made no mention of the Fortune affidavit but referred to "copies of documents." Again one might suppose that the Fortune affidavit about which he wrote to Lynch was one of the "documents" he referred to in his memorandum to Quinn. But in writing to Quinn on the same day that he wrote to Lynch, DelGiudice was even more equivocal than he was with Lynch. He went no farther than to say to Quinn that the documents "seem to indicate [the site's] compliance with zoning requirements." What the words "seem to indicate" meant, in light of the fact that he never used with either of them what attorneys regard as a term of art — viz. "a legal non-conforming use" — is left to conjecture.
Not only is one unable to discern what DelGiudice relied upon in forming his opinion, there is also a question whether the Fortune affidavit which he mentions in Exhibit 46 is the same affidavit which is in evidence as Exhibit 55. In Exhibit 55, Fortune does not limit the use of the site as a landfill to the year 1944 as does DelGiudice but claims such a use without interruption since 1927.
DelGiudice's opinion came within a month prior to LRR's receipt of its first license in 1976. What prompted his involvement was both unnecessary and unauthoritative. As Stevenson testified, the Department of Health's regulations (Exhibit 33B) did not make permitted zoning use a sine quanon to licensing. Even in 1982 when the regulations were revised (Exhibit 34F; section 4.04) the grant or renewal of a license did not depend on proper zoning. Until DelGiudice became involved, Stevenson did not consider zoning to be an "impediment" to licensure. This fact can be deduced not only from Stevenson's testimony but also from Exhibit 59, the license worksheet he was using to determine whether the plaintiff complied with the regulations as a prerequisite to licensing. As originally created by him, as to zoning the worksheet prompted him to determine only that the plaintiff's radius plan depicted the zoning districts of the land. The regulations did not require an applicant to affirm that the intended use was a specifically permitted use. In keeping with the regulations upon which the worksheet is obviously modelled, he made no provision to check off whether a sanitary landfill was a permitted use on plaintiff's land. After DelGiudice became engaged in the process, Stevenson added this reminder in his hand to the worksheet: "Zoning (Del)." With receipt of the opinion, he crossed out that note and wrote: "Zoning OK Del." What this evidence shows unmistakably is that Stevenson would have recommended that the license be granted to LRR even if DelGiudice had never been involved.
The fact that DelGiudice's opinion lacked legal authority can perhaps best be illustrated by postulating that he had rendered a contrary opinion, that is to say, that his opinion was that in 1976 the Zoning Ordinance barred the use of Lot 9 for plaintiff's intended purpose. Judging from Stevenson's testimony and the 1975 regulations, it can be said that LRR was entitled to the license anyway. But if the supposed opinion caused denial of licensure, plaintiff's remedy becomes quite obvious. It is not to be sought from the director of the Department of Health or from the courts; it is to the same place where the plaintiff sought relief in early 1976 — to the Town of North Smithfield. Section 11.1 of the Town's Zoning Ordinance (Exhibit 42) made it mandatory that "all questions of interpretation and enforcement shall be first presented to the [Zoning] Inspector. . . ." If that official decided that zoning was no impediment to licensure, the plaintiff would have received a certificate of zoning compliance by virtue of section 7.4. Viewed from this aspect, the superfluous nature of the DelGiudice participation is readily apparent. More important in the Court's perspective is that since the plaintiff could not be bound by anything DelGiudice submitted, neither could the defendant be bound. This is all the more true since it would appear that, if any authority had been delegated to DelGiudice, he exceeded the scope of that authority. It must be recalled that the Health Department's legal department had instructed Stevenson that a landfill license could not be issued for an area "where the zoning does not specifically permit
sanitary landfilling." (See Exhibit 65.) (Emphasis added.) The parties agree that the Zoning Ordinance did not specifically permit Lot 9 to be used as a sanitary landfill. (Stipulation of Fact 40) The phraseology of that stipulation is misleading. In reading it, one might think that it was somehow otherwise permitted. The opposite is true. The Zoning Ordinance, when read with the zoning districts delineated by plaintiff's application, showed that a sanitary landfill was specifically prohibited on Lot 9. Such a fact should have brought DelGiudice's task to an end. He had no warrant to proceed to the interpretation of "copies of documents." It was not for him to say that the "landfill site meets all of the zoning requirements." Yet LRR insinuates that the DelGiudice opinion really results disadvantageously. It argues at page 106 of its Post Trial Memorandum that "it had no reason to appeal the agency's finding on zoning — because the agency found in our favor." But LRR well knew and recognized from its earlier petition to re-zone Lot 9 (Exhibit Q) that the agency had no authority to render a "finding" on zoning.
In the Court's judgment, the rendering of an opinion by DelGiudice for the benefit of his department certainly does not redound to the plaintiff's benefit nor prevent the State from contending in this case that the Zoning Ordinance would not permit the southern part of Lot 9 to be used for dumping trash. To the plaintiff's question, then, as to the purpose which was served by the 1976 opinions given by counsel, the most temperate response is: none.
At this juncture, it is opportune to discuss a more direct opinion which was testified to by Mr. Roy C. Schaeffer. He was called to inform the Court regarding the value of LRR's real estate on July 13, 1983. He also gave it as his opinion that Lot 9 had the benefit of a legal non-conforming use. While the Court rejects his general credibility for reasons which will be discussed later in this decision, here the Court gives no weight to his opinion that Lot 9 has a legal non-conforming use attached to it. Whatever his qualifications may be judged to be, he is not qualified to voice that opinion. The existence vel non of such a use involves a mixed question of law and fact and is a determination to be made by the Court.
F
Nor does the plaintiff's claim of a non-conforming use gain legitimacy by its reliance on evidence permeating an argument bearing repetition here:
 Although all of the southern part of Lot 9 is in an REA zone, the northern part of Lot 9 covers both REA and RA zones. Dumping was planned for and approved in both zones ever since the first application in 1976; the state never distinguished between the zones on Lot 9 in regulating the site.
When in 1983 the Consent Order was entered, it required dumping in the REA zone; and dumping actually took place in the REA zone during the next 18 months. If we hear it correctly, in 1983 the state urged Judge Almeida to approve and impose a dumping scheme which the state now says is illegal. [Post Trial Memorandum 56] (Emphasis in the original.)
The Court has found that the issuance of a license to the plaintiff did not restrict the plaintiff's activity to the area north of the swale. The evidence in this case has led the Court to conclude that if LRR decided to shift its operation to the area south of the swale, its license would permit it to do so assuming continued compliance with the State regulations from time to time in force. It was not for the State either to ascertain whether the zoning laws of North Smithfield were observed or to enforce those laws were the licensee to breach them. A license to dump on Lot 9, therefore, did not translate into a State granted variance to use land as a sanitary landfill if the Town ordinance prohibited such use. A fortiori, the State would be similarly powerless, on July 13, 1983, to legitimize dumping in the REA portion of Lot 9 or to declare by any means that the plaintiff was entitled to a non-conforming use in that location or in any other location on the southern part of Lot 9. The division of powers between State and Town is both fundamental and simple. Only the State could say who could dump trash; only the Town could say where the trash could be dumped. Of course, there is no question that the State joined with the plaintiff on July 13, 1983 in causing entry of judgment in this case by this Court. But whether or not in that joinder "the State urged Judge Almeida to approve and impose a dumping scheme which the State now says is illegal" is patently beside the point. In issue here is not the State's conduct before the Court that day but whether LRR could legally operate a landfill in 1983 on the southern part of Lot 9 under the Zoning Ordinances of the Town of North Smithfield. That issue finds no resolution in the judgment of July 13, 1983. It may be argued that when the Town withdrew its appeal from that judgment, it lost any right to enforce its zoning laws with respect to the use of the portion of the land, encompassed within the judgment, which constituted a zoning violation. Be that as it may, the judgment did not have and could not have any force or effect beyond the geographical limits circumscribed by the agreement which this plaintiff and this defendant submitted to the Court for approval. Neither the proceedings before the Court that day (Exhibit 21) nor the judgment entered (Exhibit 19) spoke to the zoning status of that part of Lot 9 which the plaintiff is here claiming entitlement to use as a landfill.
G
It is obvious that the plaintiff recognizes the limiting effect of the 1983 judgment because it seeks to avoid its consequences by invoking the doctrine of estoppel. This proposition is set out broadly at pages 103 to 109 of its Post Trial Memorandum. The plaintiff comes close to the point by this oblique statement at 108:
 The state's counsel successfully urged that Judge Almeida enter the 1983 Consent Order over the objection of the Town of North Smithfield. The operating plans which were approved by the state and its engineers required landfilling on land lying in the REA zone; the state should not be heard now to say it urged the Court to approve an unlawful use in that zone. [Ex. 20C, 21, 44]
What the Court was urged to approve was the closure plan agreed to between LRR and the State. The Court was not urged, or even asked, to decide any question of zoning. In the respective presentations made to the Court leading to the entry of judgment neither LRR, nor the State nor the Town of North Smithfield informed the Court that its approval of the agreement might embrace a zoning violation. (See Exhibit 21.) The Court was certainly entitled to proceed on the assumption that all which was being sought was in conformity with law and, from that aspect, the plaintiff is correct in saying that the State cannot now aver that the dumping in the REA zone was "an unlawful use."
To give the State its due, however, it must be discerned that the State is not now changing any position taken by it before the Court in 1983. Its position today is that the use of the southern area of Lot 9 as a sanitary landfill is not a use permitted under North Smithfield's Zoning Ordinance. The State says nothing today about the propriety of dumping in the REA zone contemplated by the closure plan. Looking at LRR's reliance on the doctrine of estoppel in the light most favorable to it, what the plaintiff appears to be saying is that since the defendant must have regarded the dumping in the REA zone north of the swale as a legal act, it ought not to be permitted now to say that dumping south of the swale, which lies entirely in an REA zone, would be an illegal act. In addition, the plaintiff looks again at DelGiudice's decision and tells the Court that the State "`acted affirmatively' when [it] confirmed compliance with the applicable . . . zoning laws." [Post Trial Memorandum 105] The plaintiff might have gone even further and pointed to hearing officer Geremia's decision, approved by the director of DEM, authorizing trash disposal south of the swale. The upshot of these arguments is that even if, in fact and law, the plaintiff could not have dumped on the southern portion absent closure, the defendant should be foreclosed from saying so.
The plaintiff relies on a series of cases beginning withMurphy v. Duffy, 46 R.I. 210 (1924) to sustain its call upon estoppel. A commonality of the cases is that a governmental entity is not per se immune from the doctrine. Typical of the standard for its application is the language of Chief Justice Roberts in Ferrelli v. Department of Employment Security,106 R.I. 588 at 594 (1970):
 It is, then, our opinion that in an appropriate factual context the doctrine of estoppel should be applied against public agencies to prevent injustice and fraud where the agency or officers thereof, acting within their authority, made representations to cause the party seeking to invoke the doctrine to act or refrain from acting in a particular manner to his detriment.
The standard was further defined in Greenwich Bay Yacht BasinAssociation v. Brown, 537 A.2d 988 (R.I. 1988) in which Justice Weisberger said at 991:
 The intervenors and CRMC object vigorously to the granting of relief to Greenwich on the ground of equitable estoppel. All parties recognize that this court has applied the doctrine of equitable estoppel against administrative agencies and municipal authorities under circumstances where justice would so require. Our prior cases recognize the doctrine of equitable estoppel and the fact that said doctrine may be applied to a governmental authority as well as a private party when appropriate circumstances and principles of equity so require. It is also apparent from the [cited] cases that this relief is extraordinary and will not be applied unless the equities clearly must be balanced in favor of the parties seeking relief under this doctrine. (Citations omitted.)
A case not relied upon by the plaintiff, Raymond v. B.I.F.Industries, Inc., 112 R.I. 192 (1973), is also informative. The court quotes Justice Joslin at 198 with appropriate editing so that the language will relate to the parties here:
 [LRR] also invokes the doctrine of estoppel or of estoppel in pais. To be entitled to claim the protection of the former burdened [LRR] with establishing some affirmative representation or equivalent conduct of [the State] which was intended to and did in fact induce it to act or fail to act in reliance thereon to its disadvantage. (Citation omitted.)
 While in substance no different, [plaintiff's] burden with respect to a claim of an estoppel in pais, or an estoppel by silence, called for proof that [the defendant], though in the circumstances under a duty to speak, refrained from doing so and thereby led it to believe in the existence of a state of facts in reliance upon which it acted to its prejudice. (Citation omitted.)
The evidence in this case renders it manifest that there is no basis for the plaintiff's claim of estoppel.
H
Neither by its silence nor by its conduct did the State induce LRR to do anything. Leaving aside the fact that there has been no showing that DelGiudice was acting within the scope of his authority in rendering his opinion — or that an opinion was even necessary — it was the State and not LRR which was entitled to and might have relied upon his opinion. The Court uses the word "might" because, as the Court has previously alluded, Stevenson did not appear at all concerned about whether LRR could use its land for the licensed purpose. In 1976, LRR was seeking a license and one need not have a fertile imagination to divine what LRR would have done had the State denied it a license on the ground that the Zoning Ordinance prohibited the use of Lot 9 as a sanitary landfill. Moreover, need it be said again that LRR had been using that land for that purpose long before State licensure became necessary? In the face of its petition to the North Smithfield Town Council to re-zone its land (Exhibit Q), the conclusion is inescapable that LRR knew the zoning status of its land at least from the date of its acquisition, August 28, 1974. (Exhibit 3) Besides, had the petition never been filed, plaintiff, like every landowner, was chargeable with knowledge of what it could and what it could not do with its land. It is nothing less than disingenuous for the plaintiff to maintain that it was the State which led it to believe to its damage that the land was properly zoned for it to carry on its landfill business.
The dumping in REA zone following the closure order puts the plaintiff in no better position. If its agreement with the State in that respect was considered legal by the parties, it would not have been the State's conduct or its silence which led the plaintiff to negotiate the agreement because the plaintiff's position had always been that it had a right to dump on Lot 9. This is amply demonstrated by the fact that the plaintiff continued conducting its business on Lot 9 even though the Town Council refused to re-zone the Lot "to legitimize what has been going on continually for 7 years." (See Exhibit R) The evidence establishes the fact that the plaintiff placed itself in no position of prejudice in reliance upon any purported conduct or silence of the State.
Prescinding from the general proposition that the State had represented, to the plaintiff's detriment, that the plaintiff's use of Lot 9 was a permitted one, LRR would further estop the State from raising the defense that a landfill would be a prohibited use of the southern portion of the Lot. Here the plaintiff is on even weaker ground. Its burden in this regard would be to prove that by its conduct or silence the State committed itself not to raise that issue in this case. In light of its consent agreement, it is a burden it cannot achieve. By that document, the State pledged that "in any proceeding for compensation and/or damages" it would "not allege or argue" three specific issues, none of which is here relevant. The parties went further. There is a positive affirmation "that in any such proceeding" the parties "may use any relevant evidence . . . to the extent that it is otherwise admissible." (Exhibit 19, p. 7) It is to be seen, then, that the State gave specific definition to the points it would not interject in this suit for the purpose of defeating the plaintiff's claim for just compensation. Alternatively, it reserved for itself the option to raise any other defense it chose. That LRR could not run a landfill operation on the southern part of Lot 9 even if it were licensed to do so is certainly a defense validly invoked.
I
This passage abbreviates LRR's direct claim of a legal non-conforming use:
 Either all of Lot 9 had grandfather rights, or none of it did. No one gave LRR (or Landfill, Inc.) a special exception to dump north of the swale; but to dump there was lawful because — and only because — of grandfather rights which the whole Lot had earned in 1972, and 1969, and before. [Post Trial Memorandum 56] (Emphasis in the original.)
The evidence of plaintiff's conduct belies the certitude of that expression.
According to Charles Wilson, LRR was dumping on Lot 9 well before the licensing act became law on July 1, 1974 and before it acquired the land on August 28, 1974. More than a year elapsed after it took title before LRR was made aware that the licensing process had begun. On November 24, 1975, the Department of Health provided LRR with the newly promulgated licensing regulations and followed up with a letter dated December 16 1975. (See
Exhibit 62.) Within weeks, LRR was stimulated to action in an area which, the Court finds, was disassociated from the regulations. For reasons which this record does not satisfactorily disclose, LRR asked the North Smithfield Town Council to change the RA and REA use zones of its land to a "sanitary landfill use." (Exhibit Q) The same metes and bounds description of the land as conveyed to the plaintiff served as the description for the land sought to be re-zoned. (See
Exhibits 3 and Q.) The council's minutes of the hearing held on the petition on February 23, 1976 report that Lynch, LRR's counsel, stated, "[T]that Landfill and Resource Recovery, Inc. [sic] wished to legitimize what has been going on continually for 7 years," (Exhibit R) meaning, to repeat, since 1969. It also records Charles Wilson, "[i]n recapping . . . urged [the] Council to take [the] first step to legitimize operation." Among the Exhibits which the council had before it was the "[a]greement dated 9/2/69 with Landfill (Harvey Fortune)," obviously the agreement which is Exhibit 53 in this case. The council refused to grant relief.
What is curious about this entire episode is why the plaintiff felt it was at all necessary if it was true that it already possessed "grandfather rights which the whole Lot had earned in 1972, and 1969, and before." The exercise prompts the view that the landfill operation for "the whole Lot" needed validation. The conundrum is further obscured by the fact that there is no evidence that Landfill, Inc. or LRR had ever been issued a certificate of zoning compliance. Section 7.4 of the Zoning Ordinance became applicable to Landfill, Inc. on September 1, 1973, the effective date of the ordinance. If it considered itself entitled to a legal non-conforming use, it was obliged by the ordinance to confirm that fact by having such a certificate issued to it. It had until November 30, 1974 to apply for it. By that time, LRR had become the owner. If Landfill, Inc. had not obtained the certificate, it became LRR's responsibility to do so. This route to legitimation by LRR, it seems to the Court, would have been much simpler than the one pursued unsuccessfully in early 1976. Its conduct in seeking re-zoning and its failure to obtain the required certificate neutralizes Fortune's testimony and would be the cause of serious doubt that any part of Lot 9, let alone the southern part, had the benefit of a legal non-conforming use. All that aside, the Court reads LRR's re-zoning petition as LRR's recognition that any right it had to use Lot 9 as a sanitary landfill did not extend to "the whole Lot." The Court's reason for so finding will be set out in its discussion of the 1973 Zoning Ordinance hereafter.
In referring to the years 1972 and 1969, the plaintiff harks back to the two years in which Landfill, Inc. and/or Fortune executed contracts with the Town for the disposal of waste generated by its townspeople. Speaking of the 1969 contract, which is Exhibit 53, plaintiff said, "the site referred to in it is the whole Lot." [Post Trial Memorandum 54] Since the 1972 contract, Exhibit 54, is for all intents and purposes identical, the same language may be attributed to it.
In fact, neither contract refers to any site. This is understandable since neither Fortune nor Landfill, Inc. owned Lot 9 when the 1969 agreement was signed. It is for that reason that the agreement gave Fortune a grace period to buy land or, failing that, to obtain the right to dump the trash on someone else's land. What is evidently meant by the plaintiff is that by attaching a drawing to the contracts and labelling the configuration "Lot 9," it is designating the entire Lot in compliance with paragraph 5 of each contract which reads, again:
 The Contractor agrees to furnish the Town with a map showing the exact location of the landfill operation which he intends to use during the term of this agreement.
For reasons which will be explicated later, the Court is of the opinion that the contractual language, the drawing of Lot 9 or the disposal of trash prior to 1969, individually or collectively, are not sufficient to imbue "the whole Lot" with a non-conforming use.
It is important to be aware that the "Lot 9" which is crudely depicted as part of the 1969 and 1972 contracts is not the same land mass that is the "Lot 9" involved in this controversy. Because so many distances involving the courses describing the boundary of the Lot are missing from the drawing, it is impossible to say to what extent that land as depicted is included in the present day "Lot 9." The plaintiff informs the Court that, "In 1969 Lot 9 . . . contained land later carved off to become Lots 9A and 90." [Post Trial Memorandum 54] This information assists the Court in finding that the boundaries of Lot 9 in 1969 were the same boundaries of the Lot conveyed to the plaintiff in 1974. For purposes necessary to this decision, the Court concludes that how the land appeared in those years is represented by what now are Lots 9, 9A and 90 as best shown on Exhibit JJJJ. The Court observes that the descriptive distances bounding those three lots are, in the main, identical to the distances set out in the deed to the plaintiff.
Of significance to this issue is the fact that when North Smithfield executed the 1969 and 1972 contracts there was in effect the Town's Zoning Ordinance which had been adopted on September 27, 1960 — Exhibit 66. Since the ordinance did not exempt the Town from its application, it was bound by its terms like anyone else. (See Nunes v. Town of Bristol,102 R.I. 729, 232 A.2d 775 (1967)). The ordinance did not permit a sanitary landfill in any of the Town's zoning districts. Nevertheless, it did allow that, "Uses and structures existing on the effective date of this ordinance, shall be permitted to continue under the provisions of Article IV of this ordinance." In pertinent part, Article IV said:
 A pre-existing use is any use of land or of any structure which was in lawful use at the time of passage of this ordinance, but which is not in conformity with the provisions of this ordinance. Any pre-existing use shall be permitted to continue until such time as such use is discontinued, destroyed, demolished, or changed to another use.
It is to be presumed that when North Smithfield contracted with Landfill, Inc. in 1969 for the dumping of trash within the Town borders, it obeyed its own Zoning Ordinance and contemplated the dumping to be carried out only on land where that use was lawful at the time of the passage of the ordinance. Bearing in mind that it does not appear that either Landfill, Inc. or Fortune owned land which met that standard, they were required to obtain it within the time specified in the agreement. To insure that the land intended to be used as a sanitary landfill was land qualifying as a pre-existing use, the Town also required Landfill, Inc. to furnish it "with a map showing the exact location of the landfill operation [Landfill, Inc.] intends to use." Landfill, Inc. bought the 53 acre Lot 9 and, instead of demonstrating "the exact location" where on the 53 acre Lot 9 trash would be dumped, it provided a drawing of the boundaries of the entire Lot.
The fact that North Smithfield permitted that Lot 9 to be used to fulfill the purpose of its contract in 1969 is evidence that it recognized that Lot as having been used as a dumping ground for trash before 1960. Fortune's affidavit, Exhibit 55, supplies corroborative evidence. As the Court understands his testimony, in 1959 he was a part owner of a trash disposal business and for several years before had dumped a substantial amount of solid waste on the Lot. He also states that the premises had been used continuously as a landfill operation to the date of his affidavit, September 1, 1976. It is not surprising that when it became necessary to carry out the 1969 contract with the Town, the land which was purchased was the very same land which he had already been using as a sanitary landfill.
The Court finds that the use of the 53 acre Lot 9 as a sanitary landfill existed before such use was prohibited by the Zoning Ordinance of 1960.
As informative as the Fortune affidavit may be, it gives no clue about the specific area on Lot 9 which was being used as a dump before 1969. As noted, the land then consisted of 53 acres in contrast to the 37 acres of the present day Lot 9. (See
Exhibit JJJJ.) The evidence is strong that the pre-1969 trash disposal took place somewhere other than the area north of the swale.
As a starting point, the Court notes Charles Wilson's testimony that both before and after LRR bought Lot 9 in 1974 all of its disposal operation took place north of the seasonal swale. He stated affirmatively that none occurred to the south. The evidence also shows that Landfill, Inc. used the same location to carry out its 1969 contract with the Town. As part of its license application process, LRR told the State this:
 The sanitary landfill operated by Landfill 
Resource Recovery, Inc. was started in 1969 at the request of the Town of North Smithfield, on a site selected by the Town, and the then owner of the site. Harvey Fortune. (Ex. 7, p. 1) (Emphasis added.)
At a later date, both LRR's attorney Lynch and Joseph Corcoran, its president, asserted the same thing to the Town Council. While Corcoran said that, "this site has existed since 1969," Lynch was more specific. He said that LRR "wished to legitimize what has been going on continually for 7 years." (Exhibit R) What had been going on for seven years was, of course, dumping north of the swale. In 1979, Bourget, the Town's zoning official, acknowledged the same thing. In his May 1st letter to the plaintiff he said, "The landfill operation was created pursuant to a contract with the Town in 1970," undoubtedly referring to Exhibit 53. (Exhibit 58) While particularly persuasive are the words "was started in 1969" and "was created," the entire fabric of this evidence convinces the Court that Fortune and the Town officials decided that the 1969 contract would be fulfilled by using an area of Lot 9 not previously used from dumping — the area north of the swale.
Fortune's affidavit speaks of trash disposal on Lot 9 before 1969. This was certainly carried out in part at the southeast corner of today's Lot 9 where the legend "old fill area" appears on Exhibit 10B. When he was asked what that reference meant, Richard Peluso testified, "Previous landfill was operated in that corner of the property." He later added that, "I actually saw some debris there . . . things that would be typical of an old landfill." [Tr. 237-238] Given the long period over which Fortune said that trash disposal was conducted on Lot 9 before it was dismembered, there is a convincing probability that the bulk of the dumping was done on what are now Lots 90 and 9A. Having in mind that Pound Hill Road was then and is now the major road when compared with Oxford Road and that there is a fifty-foot wide corridor off Pound Hill Road which made a dumping area on Lots 9A and 90 easily accessible, the reasonable inference is that convenience dictated dumping in those areas. It is of some importance, in assessing this probability that the "old fill area" spilled out from Lots 90 and 9A onto today's Lot 9, that the plaintiff's 1976 petition to obtain a sanitary landfill classification was not confined to the present day Lot 9 but included the other two lots. The absence of the legend "old fill area," on Exhibit 10B and other exhibits, to the east beyond the easterly boundary of today's Lot 9 is understandable because today's Lot 9 was the only land area which had any significance to the 1976 license application.
Although LRR was conducting its business operation north of the swale under the protection of a pre-existing use, neither that fact nor the existence of the old fill area at the southeast corner of its Lot can support its claim that the "grandfather rights" applied to "the whole Lot."
J
Whatever might be said about the regulation and use of land in North Smithfield under its 1960 Zoning Ordinance calls for re-examination today because on September 1, 1973 a more definitive Zoning Ordinance came into play. There is a dramatic difference in detail between the 1973 ordinance (Exhibit 42) and its predecessor. Insofar as the plaintiff's claim of a non-conforming use for the entirety of Lot 9 is concerned, the difference can best be demonstrated by setting out the portions of the 1973 ordinance which bear upon LRR's claim. The Court reproduces only so much of the ordinance as it considers necessary for an understanding of its decision.
A general, introductory statement in respect to non-conforming uses is found in § 4.1.
 Sec. 4.1 Intent
 Within the districts established by this ordinance or amendments that may later be adopted there exist: (a) lots, (b) structures, (c) uses of land and structures, and (d) characteristics of use which were lawful before this ordinance was passed or amended, but which would be prohibited, regulated, or restricted under the terms of this ordinance or future amendment. It is the intent of this ordinance to permit these non-conformities to continue until they are removed, but not to encourage their survival. It is further the intention of this ordinance that non-conformities shall not be enlarged upon, expanded or extended, nor be used as grounds for adding other structures or uses prohibited elsewhere in the same district.
The ordinance becomes specific:
 Sec. 4.3 Non-conforming uses of land (or land with minor structures only).
 Where at the time of the passage of this ordinance lawful use of land exists which would not be permitted by regulations imposed by this ordinance, and where such use involves no individual structure with a replacement cost exceeding one thousand dollars ($1,000.00), [sic] the use may be continued so long as it remains otherwise lawful, provided:
 (a) No such non-conforming use shall be enlarged or increased, nor extended to occupy a greater area of land than was occupied at the effective date of adoption or amendment of this ordinance;
 (b) No such non-conforming use shall be moved in whole or in part to any portion of the lot or parcel other than that occupied by such use at the effective date of adoption or amendment of this ordinance; . . . .
The evidence in this case shows that the only part of Lot 9 which was being used as a sanitary landfill on September 1, 1973 was the area north of the swale. Where the outer limits of the deposited trash may have been on that day is not known nor does it matter. It is a question which is rendered moot by the eighteen months of landfilling operation north of the swale consequent upon the closure agreement. Neither is it important for the Court to determine when the "old fill area" ceased to be an active dumping ground. It suffices that Charles Wilson has testified that, although LRR was using today's Lot 9 as a dumping ground before September 1, 1973, it never deposited trash south of the swale.
It is manifest that, under the terms of the 1973 ordinance, LRR had a right to continue using as a landfill site only that area of land north of the swale as it was using on day the ordinance became law. Critical to the existence of any non-conformity was use and there is no evidence that the plaintiff was using any part of Lot 9 south of the swale on the effective date of the 1973 ordinance. The plaintiff, to be sure, was intending to use "the whole lot" in the future but actual use and not intended use is what North Smithfield requires.
This interpretation cannot be new to the plaintiff. Although the evidence does not bring to light, in so many words, the motivation for the plaintiff's journey to the Town Council in 1976, the Court is persuaded that it was undertaken because the plaintiff realized how delimiting was its right to carry on its business. Its attorney was as capable of interpreting the ordinance then as the Court is today. It would appear that, with State licensing on the horizon, the plaintiff considered it prudent to obtain a clean bill of health on zoning. Had it asked for a certificate of zoning compliance, it would have received what it did not want — a zoning official's statement that the non-conformity was circumscribed by the area of its then extant use north of the swale. The clear-cut answer to the seeming dilemma was to have all the land re-zoned to the sanitary landfill classification.
K
In the course of testimony, Schaeffer construed § 4.3, abstracted above, to mean that LRR could expand or extend its use from the north and into the remainder of Lot 9 but "may not acquire more land and continue to use beyond that area." [Tr. 687] The plaintiff takes the same tack:
 Generally, once a non-conforming use exists, it may develop and grow naturally. State v. Szymanski, 24 Conn. Sup. 221, 489 A.2d 514, 516 (1962), Salerni v. Scheuy, 140 Conn. 508, 102 A.2d 528 (1954). Courts have recognized that expansion is necessary for the survival of a business classified as a non-conforming use. MacMahon v. Board of Zoning Appeals, 140 Conn. 433, 441, 101 A.2d 284, 288 ("Ordinarily businesses either grow or shrivel up. They seldom stand still."); Upper Darby Township Appeal, 391 Pa. 347, 138 A.2d 99, 102, ("An ordinance which would allow the housing of a baby elephant cannot evict the animal when it had grown up.") [Post Trial Memorandum 57]
Considering the terms of § 4.3, Schaeffer's interpretation is patently wrong. The language selected by the North Smithfield Town Council to express its intention about non-conforming uses is so clear as to forbid interpretation. That language, rather than the general principles and holdings of the cases cited by the plaintiff in its argument, controls in this case. It may be said, parenthetically, that the McMahon case appears to say, at 101 of 138 A.2d, that normal expansion is recognized by Pennsylvania law. Further, the Salerni case does not support the proposition for which it is cited but holds to the contrary: the extension or enlargement of the non-conforming use which was being sought was prohibited by the zoning ordinance.
To leave no room for doubt, the North Smithfield Town Council defined the scope of the rights inhering in a non-conforming use in two ways. In 4.3(a) it says that the use could not be expanded beyond the area it occupied on the ground on September 1, 1973. In 4.3(b) it says that the use could not be moved to another part of the lot on which the use existed on September 1, 1973. On September 1, 1973, LRR was using the part of Lot 9 north of the swale in non-conformity with the ordinance. In terms of this case, the ordinance means that LRR could not thereafter expand the non-conformity in the north or move it south of the swale.
To avoid the consequences of the evident purpose of the ordinance, LRR regards Lot 9 as a "depletable resource." It argues at 58 of its Post Trial Memorandum:
 Under the "diminishing asset doctrine," courts have allowed quarrying (a use with a depletable resource such as ours) to extend beyond the original area of extraction without being considered an unlawful expansion of a prior non-conforming use.
Although the plaintiff equates its "intention to use the entire property," Id. 60, to that of an extractive business, the two are obviously not the same. Heaping garbage on a parcel of land simply does not qualify as an extractive business. Moreover, and more important, the North Smithfield Zoning Ordinance took the trouble to classify the extractive and landfill businesses as different uses. § 5.4.10(38) classifies "[m]ining, quarrying, sand and gravel extraction, loam stripping" as one use, and § 5.4.10(39) classifies "[s]anitary landfill (to include hazardous waste)" as a different use.
The thrust of the plaintiff's argument here is that whenever it had filled the northern area to capacity it would have depleted the usable land in the north and, without closure, would be entitled to continue the non-conformity to the south until the entire lot was filled to capacity. If one accepts the definition of "to deplete" to mean "to render no longer useful" then, of course, the northern portion of Lot 9 was rendered no longer useful as a landfill after the 18 month closure operation. But such a definition would nullify the regulatory scheme devised by the North Smithfield Town Council. Such a definition would permit an owner of a non-conforming new car franchise housed in a building occupying one half of the franchisee's land to expand into the other half because its franchisor demands the expansion at the risk of the loss of the franchise. On the theory advanced by the plaintiff, the automobile dealer depleted the useful area of its land when the size of its business outgrew the showroom and, hence, because its franchise is at risk, is entitled to build an addition on the remainder of the lot. Assuming thedicta found in McMahon, supra, to be sound, if the dealer's business is not permitted to grow it will shrivel to nothing because businesses not only seldom stand still but may, in this dealer's case, come to an end. Such an interpretation renders meaningless the language of the ordinance that the non-conforming uses of the plaintiff and the dealer "shall [not] be enlarged or increased, nor extended to occupy a greater land area than was occupied at the effective date of adoption. . . of this ordinance."
It seems to the Court for it to have been a difficult task for North Smithfield to fashion language which more clearly expressed its attitude that non-conforming uses were anathema without using the word itself. The Court has already cited the council's language that while non-conforming uses are permitted "to continue until they are removed," their "survival" was not to be encouraged. Having considered the language of the ordinance regarding non-conformities, the Court is not persuaded that the plaintiff is entitled to a non-conforming use in the southern sector under its description of the "diminishing asset" doctrine.
The Court finds, hence, that, on July 13, 1983, the North Smithfield Zoning Ordinance prohibited the use of Lot 9 south of the swale, situated in an REA use zone, as a sanitary landfill.
This finding is in accord with that part of the State's case wherein the proposition is that the closure order is unrelated to the plaintiff's claim of an inverse condemnation because LRR could not have continued in the landfill business even if the license had validity on July 13, 1983. The State's hypothesis has been that if it had permitted LRR to operate, North Smithfield would have prevented the operation and therefore it is to North Smithfield that the plaintiff should look for damages and not to the defendant.
Upon the contingency of the Court's present finding, the State has gone further and has sought to eliminate the potential availability of a variance to the plaintiff. The State proceeds in that direction upon its view that any landowner situated as was the plaintiff on July 13, 1983 had a right to petition for a variance to continue its landfill business. It is obvious that by the time July 13, 1983 came around, it would have been fruitless for LRR to then ask for relief because even if relief were granted by the Zoning Board of Review, the State's revocation of the plaintiff's license would have put an end to its business. In this context the defendant, at page 17 of its Post Trial Memorandum, cites the plaintiff's failure to prove that there was a reasonable probability of a grant of a variance and continues:
 Although it is possible that a variance could be granted, the granting of such a variance is [improbable]. In fact, the evidence presented at trial, leaves no doubt as to the probability or in this case the improbability of the approval of a petition for a variance.
It is this issue to which the Court turns.
L
In what is perhaps the most lucid expression to be found in Rhode Island zoning case law in respect to variances, Justice (later Chief Justice) Roberts wrote:
 This power to vary the terms of an ordinance is conferred exclusively upon [zoning] boards of review by Section 45-24-13 of the enabling act, and in its exercise these boards must comply strictly with the provisions of the enabling act which confer this power upon them. The pertinent provision is to be found in Section 45-24-19c. [now 45-24-19(1)(c) (1991 Reenactment)] wherein the legislature empowered such boards "To authorize upon appeal in specific cases such variance in the application of the terms of the ordinance as will not be contrary to the public interest, where owing to special conditions a literal enforcement of the provisions of the ordinance will result in unnecessary hardship, and so that the spirit of the ordinance shall be observed and substantial justice done." The genesis of the variance is in constitutional considerations. It was devised to permit the orderly alleviation of zoning classifications which so restrict the use of land as to become confiscatory.
 In Denton v. Zoning Board of Review, 86 R.I. 219, at 221, we said that the general assembly conferred this power to authorize variances upon boards of review intending "to vest these boards with authority to prevent the indirect taking of land without compensation by depriving the owner of the beneficial use thereof." The legislature, aware of the impact that zoning classifications may have on land ownership in peculiar circumstances, intended to entrust an agency of its own design and creation the power to alleviate any hardship that might arise out of the peculiar situations through the granting of a variance. These agencies are the boards of review provided for in the act. Nothing in the enabling act warrants a conclusion that the legislature contemplated that boards of review would exercise this important power in accordance with the dictates or directions of the local legislatures. The power thus conferred upon the boards of review to grant variances is subject neither to enlargement nor restriction by provisions contained in local ordinance. (Cite omitted.) Mello v. Board of Review of Newport, 94 R.I. 43, 46 (1962).
The Court has deemed this rather lengthy reproduction to be necessary because it delineates the principles which bind North Smithfield in its consideration of any petition for a variance. In addition, they provide guidance to the Court in deciding whether the defendant's conduct on July 13, 1983 constituted a taking of plaintiff's property.
To illustrate the near-certain action which the North Smithfield Zoning Board of Review would take in response to a petition for a variance, the Court abandons the hypothetical and embraces the factual. It is a fact that on October 30, 1981, after an extended hearing, the director of DEM entered an order the general effect of which was to halt further use of Lot 9 north of the swale but to permit the landfilling operation to be carried on south of the swale. (Exhibit 38) One of the persons who testified at that hearing was Bourget, North Smithfield's zoning officer. It is palpable from his October 30th decision that the director had the same lack of concern about the zoning status of Lot 9 as was reflected in Stevenson's conduct. Exhibit 38 is not informative about the content of Bourget's testimony but it was dismissed in this single sentence: "Whereas his testimony largely centered on zoning issues, issues more properly before the Zoning Board of Review of North Smithfield, his testimony is of little moment here." As compendious as that statement is, it at least portrays the concern of the Town of North Smithfield, represented by the presence of its zoning official, about the adherence of plaintiff's activities to the Town's zoning ordinances. Quite rightly, the director took the position that the matter was of a concern to the Zoning Board but not to him.
With the issuance of the order, the plaintiff became a licensee of a sanitary landfill on the southern part of a lot in a Town where the Zoning Ordinance prohibited the license to be exercised. If, at this juncture, the plaintiff sought a variance and proved that it would be deprived of all beneficial use of its land if the variance were denied, the Court is persuaded from the evidence that relief would not be granted. As Mello, supra,
makes clear, § 45-24-19c. states that a variance may not be granted if to do so would be contrary to the public interest. There is an abundance of evidence to indicate that North Smithfield would regard a landfill operation south of the swale to be contrary to the public interest.
To begin with, the part of Lot 9 which continued to be licensed by the 1981 order lay entirely in an REA district. One of the reasons that North Smithfield established that district was "to provide protection to areas where conservation of water bodies and streams are of significant importance;. . . ." (Exhibit 42, p. 1133) Within months of the director's order, the State's refuse disposal act, Chapter 23-18.9, was amended byPublic Laws 1982, Chapter 33. The amendment bears the title: "An Act Relating to Disposal of Solid Waste Over Drinking Water Sources." The parties here refer to it as the "Aquifer Protection Act." (Stipulation of Fact 22) By the amendment, § 23-18.9-8.2 was added to the pre-existing refusal disposal act. The first two subsections of § 8.2 read:
 (a) The general assembly recognizes and declares that disposal of solid waste on or in the ground overlying underground drinking water sources is not an environmentally sound solid waste management practice and that such disposal could threaten public health with contamination of existing and future municipal drinking water supplies.
 (b) No person shall dispose of solid waste on or in the ground overlying ground water reservoirs or groundwater recharge areas, as identified on a map entitled "State of Rhode Island `208' Areawide Water Quality Management Plan-Water Related Sensitive Areas" prepared by the Statewide Planning Program (project FRC-JF-01-13), provided that such groundwater reservoirs or groundwater recharge areas have been designated on the basis of hydrogeologic data, as an existing or planned public drinking water source by the municipality in which such reservoir or recharge area is located and that such municipality has enacted a municipal ordinance relating to groundwater reservoirs or groundwater recharge areas.
Neither North Smithfield nor DEM delayed in utilizing the new legislation. On September 30, 1982, the DEM director notified the plaintiff to appear at a hearing in implementation of the legislation's purpose. (Exhibit 39) The notice of the hearing told the plaintiff what the Town had done since § 8.2 had become law on May 6, 1982:
 The Town of North Smithfield has designated the groundwater reservoir or groundwater recharge area underlying [your] landfill, as identified on a map entitled "State of Rhode Island `208' Areawide Water Quality Management Plan-Water Related Sensitive Areas" . . . as an existing or planned public drinking water source and enacted an ordinance relating to said reservoir or recharge area.
 By resolution of the Town Council of North Smithfield, adopted August 10, 1981, [sic] said Town Council has petitioned the Director to determine whether or not the continued operation of said landfill presents a hazard to the public drinking water source described above.
If one has not by now sensed North Smithfield's inclination toward the manner in which it would dispose of a petition for a variance, the Town's conduct before this Court on July 13, 1983 should render it transparent.
The administrative hearing notice was followed, in late 1982 and early 1983, with LRR and DEM entering into settlement negotiations. (Stipulation of Fact 24) The negotiations resulted in LRR and DEM obtaining the approval of this Court of the agreement which they had reached. (Stipulation of Fact 25; Exhibit 19) Their agreement and the entry of the Court's judgment brought an end to civil action 81-4091 which the plaintiff had instituted in response to the director's order of October 30, 1981. Shortly after that suit was filed, North Smithfield was permitted to intervene. On July 13, 1983, when LRR and the State presented their agreement to the Court for its approval, the Town moved to withdraw as a party defendant on the grounds that it was not a party to the agreement and did not wish to be bound by the judgment to be entered upon its terms. Giving insight into both the enactment of the aquifer protection statute and the Town's expectations about the effect of that act on this landfill is North Smithfield's statement to the Court:
 [The] litigation which is presently before the Court commenced as a result of the aquifer statute, so-called. It was enacted by the General Assembly which is referred to as Title 23-18.9-8.2 which is the result of the residents of Northern Rhode Island petitioning the Legislature for this legislation to lead to the closure of this facility. (Exhibit 21, p. 4) (Emphasis added)
Whether the October 30th licensing to the plaintiff to dump trash in the southern sector galvanized the residents of northern Rhode Island to seek General Assembly co-operation in obtaining firm control of dumping activities overlying municipal drinking water sources is of little importance to the issues in this case. Both the effort exerted in that regard and the legislative response are indicative, however, that where the public interest in drinking water sources is at loggerheads with the owner's right to use its land, the public interest emerges paramount. With this evidentiary background, had the plaintiff asked North Smithfield to relieve it of the restriction which prevented the use of the license given to it by DEM on October 30, 1981, § 45-24-19c. would compel the Town to conclude that its assent would be contrary to the public interest thereby mandating denial.
The closure order certainly put an end to the plaintiff's business of running a landfill. It must be here observed that the State's power to license or not is an attribute of sovereignty and in this case the power to deny was exercised with full respect to plaintiff's rights to due process. But while the effect of the closure order on the plaintiff's business was complete, the effect of that closure order on the bundle of rights which reside in the plaintiff's ownership of Lot 9 was neutral. It must be comprehended that whether LRR was granted a license for the land south of the swale (which it was in 1981) or whether it was denied a license for that area (which it was in 1983), the North Smithfield zoning restriction would not permit it to use the land for landfill purposes.
It should not be open to doubt upon this record that the public interest which drove North Smithfield to initiate the proceeding culminating in the termination of the plaintiff's license is the same public interest which would compel the Zoning Board of Review to deny a petition for a zoning variance. But the most telling evidence that such a petition would be denied is found in the Zoning Ordinance itself. The last paragraph of § 9.3 of the ordinance reads:
 Under no circumstances, shall the [zoning] Board grant a variance to allow a use not permissible under the terms of this ordinance in the district involved, or any use expressly or by implication prohibited by the terms of this ordinance in said district.
The predictable effect of this provision may be deduced from a passage in Annicelli v. Town of South Kingstown, 463 A.2d 133
(R.I. 1983).
In that case, the Zoning Ordinance of the Town of South Kingstown prohibited the plaintiff from constructing a residential dwelling on her lot. The ordinance nevertheless empowered the Board of Review to grant a use variance under appropriate circumstances. In its defense against the plaintiff's claim that her property had been taken by inverse condemnation, the Town contended that the landowner should have sought relief from the Zoning Board after the building inspector had denied her a building permit before bringing her action. The Supreme Court answered this contention in this fashion, at 138:
 Because by the clear and unambiguous language of the ordinance construction of single-family dwellings is flatly ruled out under all circumstances, we acquiesce with the trial justice's conclusion that any attempt to have the board of review grant a special exception or variance would have been futile.
In contrast to the South Kingstown ordinance, the North Smithfield Town Council has told its Zoning Board that "under no circumstances" may it grant a variance to permit a use not in conformity with its legislative enactment setting out the uses permitted in an REA zone. In short, the Board of Review has been told that it may not grant the plaintiff a variance to relieve it of the prohibition against running a landfill on the southern part of Lot 9.
Superficially, one might argue that what the Supreme Court said concerning the office of the variance statute, § 45-24-19c., in Mello, supra, appears to be at odds with its statement inAnnicelli, supra. This Court reads no more from Annicelli
than the fact that where the local legislature employs the language of North Smithfield, a suit for inverse condemnation may be begun against the municipality without seeking prior local relief.
The rule is a practical one. Looking back to the time in October, 1981, when DEM closed the northern area but permitted LRR to operate to the south, LRR would have needed a variance to do so. One would have to be artless to believe that the North Smithfield Zoning Board would have allowed the disposal of solid waste on that land overlying an underground drinking water source.
The Court finds, as a consequence, that on July 13, 1983, the plaintiff's land in the REA zone bore a burden which deprived the land of its use as a sanitary landfill, a burden which the plaintiff has failed to prove had a reasonable probability of being relieved by the grant of a variance by the Town of North Smithfield. The Court finds that the closure order did not result in the taking of any of the plaintiff's rights of ownership in the land. Failing in its proof that the State's action was the functional equivalent of an inverse condemnation, the plaintiff is entitled to no compensation from the defendant.
III
Hand in hand with the plaintiff's failure to prove that a sanitary landfill operation would be a legal use of the southern portion of Lot 9 is its failure to prove that the director's action, taken under the aquifer protection act, deprived it of all reasonable and beneficial use of that land. In this regard, LRR appears to view its burden differently. It says at page 51 of its Post Trial Memorandum:
 As the Supreme Court said in Landfill v. DEM,
one of the questions the trial court must answer is whether the regulation deprived the owner of "all or most of his interest" in his property. Stated otherwise, did the regulation sacrifice "most of the value" of the property? 512 A.2d 868. If so, there was a taking by inverse condemnation. (Emphasis in the original)
While the words quoted by the plaintiff in the cited case are accurate, those extractions fail to reflect the fact that they represent dicta. The first quotation is itself part of a more extensive one which our Supreme Court utilized from its prior opinion in E. J. Inc. v. Redevelopment Agency of Woonsocket,122 R.I. 288 (1979). The second quotation appears in the course of the Supreme Court's reference to Annicelli, supra. The Court then proceeded to its holding and its directive as to what this Court must do in this case. It told this Court, at 869 of 512 A.2d, that the decision under review was wrong and to decide whether the director's action constituted a taking on the basis of an adequate factual predicate. The Supreme Court could very well have ended its opinion there and left this Court to rely upon precedent to determine what yardstick to use to come to its judgment whether LRR had proved a taking. But the Court went beyond. It pointed to the precedent saying:
 We also recognized in Annicelli, 463 A.2d at 140, that one of the facts to be established by the property owner who claims that enforcement of a regulation will constitute a taking is that he or she "had been denied all reasonable and beneficial use of the property."
In noting that Annicelli had proved in the trial court that her land could not be used for any purpose other than the residential use which the Zoning Ordinance had barred, the Supreme court quoted Annicelli's appraiser as testifying that $1,000 would be the "most anyone would pay *** for a spot to sit on the beach to go swimming." [136] Continuing on, at page 140, the Court stated:
 There is no question that this case is not one of mere diminution in value or use of property. The record demonstrates to us that all reasonable or beneficial use of Annicelli's property has been rendered an impossibility; consequently, under the standards promulgated by the [United States] Supreme Court, Annicelli must be compensated.
It bears comment that Annicelli reviewed municipal legislation while here the Court is considering the effects of a State statute. The Annicelli court left no doubt, however, that the enunciated standard was not restricted to municipal law alone. It said, at 141, that its ruling that a taking resulted from the Zoning Ordinance was a ruling involving ecological or environmental "legislation." The Aquifer Protection Act is ecological or environmental legislation. As a matter of fundamental fairness, a landowner who has been deprived of all beneficial use of its land by the workings of a State statute ought not to have to meet a higher degree of proof than one whose deprivation flows from a municipal ordinance. On the other hand, there is no sound reason why the former should not be required to meet the same burden as the latter.
A
With a variety of arguments in its Post Trial Memorandum [46-53], the plaintiff disavows what the record makes plain: that for as long as it conducted its trash disposal business, it enjoyed a beneficial use of the southern portion of Lot 9. It is beyond dispute that State regulations required LRR to cover its trash deposits with six inches of material on a daily basis. (Exhibit 33A, III, 3.1) To a large extent, the land south of the power line was the source of that fill. That area took on greater importance after July 13, 1983 as the plaintiff moved along toward the closure date 18 months thereafter because as the closure progressed to the maximum elevation of 370 feet the southern area became more and more the provider of fill.
With some incongruity, the plaintiff contends, at 50:
 LRR did not "realize" a profit from that soil after July 13, 1983, nor did the soil constitute a resource in place for any potential buyer of the southern section. If someone had bought the lot in 1983, then it would have become a separate
lot; and the zoning restrictions would not have permitted sale of the material to LRR or to anyone else. (Emphasis in the original)
The Court will carry the argument farther and say that if LRR owned the southern part as a separate and distinct lot, § 5.4.10(38) of the Zoning Ordinance would have prohibited it
from moving soil across the lot line separating one lot from the other. These circumstances but add value to the southern portion of Lot 9 because what would otherwise be of no value to an owner of a separate lot serves a very profitable object to the plaintiff.
It can justifiably be said that the plaintiff enjoyed a unique advantage. Before the necessity of the present arguments, the plaintiff might well have attributed this advantage to sound and prudent business foresight. Its excavation for the benefit of the existing northern landfill was to be a simultaneous benefit to the planned landfill in the south. The cavity created by the southern excavation was going to increase the tonnage of trash which would be deposited in the south. The closure order aborted the plan for a southern landfill but the benefit of its soil remained for a year and a half.
In discussing how LRR was to go about reaching the maximum elevation of 370 feet for final closure, LRR was told by its consulting engineers that about 98,000 cubic yards of soil would be used taking it from the northern site and that this amount would "provide part of the approximately 143,000 cubic yards of daily cover material required at the facility." (Exhibit 19, Exhibit A, page 4) The southern site was therefore going to be the source of 45,000 cubic yards. Charles Wilson testified that a considerable amount of southern fill became necessary for the capping of the northern portion. He estimated the amount as "in the ballpark of a quarter-million yards," the bulk of it removed after July 13, 1983. It is established by the evidence, too, that the soil had a value of sixty-five cents a cubic yard in its natural state. If, after July 13, 1983, the southern area supplied as little as 45,000 cubic yards or as much as 200,000 cubic yards, on that date that area of Lot 9 provided the plaintiff with a beneficial use valued at between $29,250 and $130,000 less the cost of labor and equipment to move it from place to place. It is to be inferred that such cost must be less than the value; if it were otherwise the plaintiff would acquire the cover material elsewhere.
The plaintiff seeks to neutralize these facts by its statement, at page 51, that, "If the soil had not been excavated after entry of the Consent Order, if it still sat there, filling space, the property would today be worth not onecent more because of it." (Emphasis in the original) This argument, too, points up the benefit accruing to the plaintiff because if the southern site were not used to provide daily cover material the plaintiff would be required to spend money to acquire the material from another source. Nevertheless, one can neither ignore nor escape a fact that cannot be controverted: that the plaintiff availed itself of a beneficial use existing on July 13, 1983 by its excavation of more than 200,000 cubic yards of cover material — a beneficial use, one might add, of which the plaintiff availed itself well before that date.
The plaintiff acknowledges in part this beneficial use when it states, at page 50, that, "The excavation of the soil was always part of the use of the entire Lot as a landfill site. . . . Viewing it as an independent operation, with independent value, is factually wrong." (Emphasis in the original) As to the latter statement, it needs to be observed only that the issue is not whether the southern portion was an "independent operation, with an independent value" but whether, on July 13, 1983, the southern portion had a reasonable and beneficial use. From the plaintiff's own evidence, there is no question that it did. As to the former statement, the Court believes it should be considered in conjunction with the following, which is argued on page 46:
 During the trial it became clear that no reasonable trier of fact would buy the state's argument, for several reasons of which one was paramount: the local zoning ordinance would permit relocating soil on Lot 9 as part of a grandfathered landfill operation on that Lot, but would prohibit sale of the soil off-site to customers as part of a commercial mining operation. (Emphasis in the original)
The plaintiff misconceives the basis of its right to relocate soil on its lot. The right does not depend upon whether the plaintiff had a grandfathered right to conduct a landfill either on the northern or southern sites. The right to re-locate the soil inheres in its ownership of Lot 9. § 5.4.10(38) presents no bar to any lot owner in an REA use district who chooses to engage in the exercise of digging up one area of the lot and dumping the excavated material upon another area of the same lot. Under one circumstance, the exercise may be foolhardy; under another, (as in this case) it may make very good sense. Excavation is not what sub-section 38 forbids in an REA zone. What is forbidden is the removal of the material off the land to another area. As that sub-section is written, it is even open to question whether, as the plaintiff suggests, the landowner may give the excavated material away for free. It certainly does not prevent the owner, however, from moving soil from one place on the lot to another place on the same lot.
In further arguing, at 48 and 49, that the use of soil for cover material during the closure of the northern area did not represent a beneficial use of the southern land, the plaintiff says:
 * * * [T]here can be no question that the state, which was monitoring the site, knew that both the north and south areas were providing the cover soil for the Lot's landfilling operation.
 The 1983 Court Order reflects that the use of the soil from the southern area was part of the closure plan which the state approved, and which it convinced Judge Almeida to enter as a final order of the Superior Court. The Consent Order requires
the closure to be conducted in accordance with the Wehran Engineering plans and drawings which were presented to and entered by the Court as part of the Order [Exhibit 19, para. 2]. Exhibit 20B (note 3) reflects that a temporary haul road was to be available "to bring cover material to be excavated from the south side of the site to the operational portions of the landfill." The same language appears on Exhibit 20C. Each drawing was part of the Court Order, and compliance with each was permitted and required as a matter of the parties' consent and by operation of law. (Emphasis in the original; footnote omitted)
Even accepting this recitation as an accurate reflection of the evidence, it says nothing to diminish in any degree the beneficial use the plaintiff enjoyed from its ownership of the southern part of Lot 9 before, on and after July 13, 1983. It is certainly true that the State had known of the plaintiff's use of the soil long before it entered the 1983 agreement. But it was neither the State's consent nor the entry of judgment by this Court which imbued the land with the beneficial use. The plaintiff enjoyed that benefit at least since the day it bought Lot 9. The sole potential concern which the State might have had is whether the cover material was of such quality as to insure the integrity of the plastic liners and thereby minimize any rupture. Evidently, the State was satisfied pre- and post-July 13, 1983 that the soil on Lot 9 was good enough for covering garbage and overlaying liners. Given State acquiescence, this Court would have had no business telling the plaintiff on July 13, 1983 that it could not use soil which it owned. It is, to say the least, hyperbolic for the plaintiff to contend that the entry of judgment by this Court, which reflected the will of the parties, infused a benefit by operation of law which benefit did not exist before.
Perhaps the shortest answer here is that if the plaintiff did not own the southern part of Lot 9, it would have had to get the cover material elsewhere. Had that been the case, it is apodictic that the entry of judgment by this Court would not have conferred a benefit on the supplier by operation of law.
Aware that the existence of a beneficial use forecloses a finding of inverse condemnation, it is urged by the plaintiff that the State be estopped from claiming that such use constitutes a defense. Its reasoning is that this suit for compensation has been initiated as a result of the closure order in which the State consented to the use of the soil. As the Court pointed out earlier, that same consent agreement specifically reserved to the defendant the right to "use any relevant evidence. . . to the extent that it is otherwise admissible" in this proceeding. The plaintiff's position apparently is that the evidence of a beneficial use, though relevant, is not admissible because of the doctrine of estoppel. Other considerations disregarded, the Court is of the view that the State's agreement for use of cover material from the southern area does not approach the prejudice which the plaintiff must show from the conduct or silence of the State. Here, at its worst, the conduct was the State's approval of the soil. This in no way disadvantaged LRR in its quest for just compensation. The approval, insofar as the defense raised is concerned, is an indifferent act because, as the Court has already said, if the State did not consent the plaintiff would have had to get the soil from another place. There is absolutely no evidence in this case that the State required that the soil come from the plaintiff's parcel and from nowhere else. It is reasonable to infer that the plaintiff used the soil from its own lot because it was in its economic interest to do so. It can hardly be concluded that once the State concurred that the material from Lot 9 would serve the intended purpose that LRR would have the same kind of soil trucked in from other property.
While the plaintiff sought to establish the existence of a "diminishing asset" in another framework, it seeks to ignore such an asset here. The beneficial use enjoyed by the parcel did not come into being on July 13, 1983. Had that date never acquired the significance which it has, the plaintiff intended to use the soil from the southern portion of Lot 9 for its northern operation well beyond January 13, 1985. Its plan was to utilize the northern area to an elevation of 455 feet. Beyond that, when the northern area had reached capacity the operation was to move south of the power line. The plaintiff projected the life of the landfill site as 65 years and that, of the 1,100,000 cubic yards of cover material available on-site, 460,000 cubic yards would be used for the entire operation. (Exhibit 7 and 15; letter of June 8, 1976 in Exhibit 7) The fact that the plaintiff's plan never saw fruition does not change the nature of the benefit which accrued to it by the availability of the cover material on-site. Recognizing that no landfill operation would ever be permitted south of the power line, instead of the diminishing asset being depleted at the planned 455 foot mark, it was depleted by consent of the parties when January 13, 1985 arrived.
B
The Court has already made mention of Schaeffer's testimony regarding the existence of a legal non-conforming use. His appearances, both in the plaintiff's case in chief and in rebuttal, also provided the Court with his opinions that the only reasonable and beneficial use for the southern part of the parcel was a sanitary landfill. If the plaintiff could not use the lot for that purpose, the only remaining benefit to the plaintiff would be to turn the land over to the Town and derive a tax credit. This area of his testimony entailed those uses permitted by the Zoning Ordinance in the REA zone in which the southern part of Lot 9 is located. It is established by the evidence that the land south of the seasonal swale contained between 13 1/2 and 14 1/2 acres. Referring to that 14 acre area, he testified:
 My opinion would be that there would be no market for that site as a single family dwelling, the reason being, once again, that there's this, I believe it's a 350 foot high mound of refuse immediately adjacent to it. There's not a paved road. It's a public road but not paved. And there had been soil removal. That, by itself, excludes the site for a single family dwelling. And I'll go further and say the documents I have read, the consent order affidavit, it's fairly apparent considerable top soil was going to be removed from that site to close the northerly portion of the landfill. All of that excludes that use as a possible use. [Tr. 636]
By the phrase "once again", he was referring to this response to a question about what someone would see to the north if one were operating a commercial animal husbandry, a permitted use, on the southern portion of Lot 9:
 He'd see a huge mound of garbage, which I am sure would raise some fears about any water in the immediate area. [Tr. 629]
He testified that there was land available elsewhere in North Smithfield for anyone seeking to buy a three to five acre lot in the Town. In this regard, the following ensued:
 Q Would that effect [sic] whether or not the southern portion of lot 9 could be used by its owner for house lots?
 A Yes.
 Q And in what way?
 A What I am saying is, there was other land available in North Smithfield, and that land was not adjacent to a closed landfill, a 350 foot mound of refuse, and therefore, there would be no demand for this site to be used for single family homes.
 Q Let's suppose that what we had on the northern portion of the site wasn't a landfill, it was just a three hundred odd foot tall pile of clean fill?
 A Clean fill?
 Q Clean fill.
 A Okay.
 Q Wasn't a landfill at all, it was just a pile. Do you think an owner could have used the southern portion of Lot 9 to market that property as single family house lots?
 A No, I don't think so.
 Q Why not?
 A That's certainly not a site amenity, that huge mound next to your property.
 Q What about aesthetic considerations, Mr. Schaeffer?
 A That's the primary consideration. Also when you say a mound of fill, it's a hypothesis that's hard to imagine, how it would arrive there in the first place. I think anyone would be suspicious of this mound in the middle of nowhere. It certainly wouldn't be a natural feature.
 Q Do you think in 1983 the owner of the southern portion of Lot 9 could have marketed that southern portion to develop, to develop single family lots?
 A No.
 Q And why not?
 A First of all, it's not a paved road. Apart from electricity, there are no municipal facilities; that puts it at a disadvantage to begin with, but most important, once again, is the mound on the northerly portion. [Tr. 638-640]
 * * *
 Q Now if somebody were in the market for a house lot, in 1983, and he was going to pay 25 or 30 thousand dollars for a house lot in that area, that didn't have a landfill pile as a neighbor up north, do you have an opinion as to whether he would buy a house lot on the southern section of Lot 9?
 A My opinion is that you could not market house lots in the southern portion at all. [Tr. 641]
 * * *
 Q So this site on the northern portion has a psychological effect which prevents the use of the southern property as a residential property?
 A Well, there are other reasons it couldn't be used for residential but that's certainly a very important one.
 Q And if the mound were composed of non-hazardous waste, would that also prevent the use of the southern property?
 A Oh, I think so. If it had been filled over the years, trucks going in there and dumping things, yes, we could describe it as clean fill, but I don't know how many people would believe that. Number 1. Number 2, you still have the, this rather grotesque hill right next to your house lot, if you really want to consider it that.
 Q So even if it were sanitary landfill?
 A I don't think anybody would believe it was sanitary landfill.
 Q So the psychological effect is, is incurred despite the fact that it's non-hazardous?
 A I don't think — people are not precise in their perception of what is going on around them day by day. I think that they perceive it as a garbage dump without regard to what specific items were going in there, whether it was hazardous or non-hazardous, I don't think they make that distinction. If it's a garbage dump, they're not going to build a house next to it. [Tr. 760-761]
The Court takes this evidence to mean that the 14 acres are not marketable for use even for the construction of one single-family residence. It is the plaintiff's effort to meet its burden to prove that the State's action resulted in a taking of the acreage. With all respect to the witness' experience and qualifications as an appraiser of real estate, the effort fails on a number of counts. Primary among the deficiencies is the lack of factual substantiation for his opinions. His experience and qualifications alone are insufficient to support opinions which, as here, rest upon intuitive feelings, psychological analysis and misconception of facts.
While he was sure that a huge mound of garbage would raise fears about water quality, which, one might add, is not a conclusion reserved to those with real estate expertise, he said nothing about how those fears would be affected by other facts in evidence. In 1976, the plaintiff reported to the Department of Health that there were seven residences within a quarter mile of Lot 9. All were active homes with wells and private disposal systems. (Exhibit 41) In the next four years, while landfilling on the northern site was in active operation, three additional dwellings were built on Oxford Road south of Pound Hill Road within a quarter mile of the lot. (Exhibit 32A) Exhibits ZZZ and JJJJ reveal that the lots involved in the construction shown by Exhibit 32A are Lots 108, 111 and 114. It would not be unreasonable for anyone interested in buying the southern section of Lot 9 to be concerned about the quality of the water next to a garbage dumping operation. But what the effect might be upon such a concern given the fact that there was such house building between 1976 and 1980 while the landfill was in overt operation Schaeffer did not venture to say.
The witness left his testimony about "fears" suspended in air. Nor did he offer an opinion whether such fears would be relieved by any other relevant fact. It is plain that he sought no information about such an important factor from LRR. Had he done so, he would have been told that a prospective buyer had no reason to be uneasy about the availability of potable water. On this matter, the plaintiff told the Department of Health in 1976, "This sanitary landfill does not affect any public water source currently in operation nor does it affect any proposed development of potable water at this time." (Exhibit 7, p. 3) It said the same thing to DEM in 1980. (Exhibit 15, p. 3) And Schaeffer should have had in mind that the very reason why the southern landfill was not permitted to come into existence was the preservation of the water source over which the landfill would have sat. While it is true that a home on Lot 9 would not have municipal water, well water was available there as it was for the other ten houses in the area.
The lack of a sewer system may affect what a buyer would be willing to pay for the lot but it has no effect on its marketability. Schaeffer does not seem to have given any consideration to the use of individual sewage disposal systems by the ten neighbors to Lot 9.
He failed to articulate the reason why the unpaved Oxford Road was of any importance in this case. It certainly cannot be because every person desirous of building a home wishes to live in a developed plat with paved roads. Just common experience informs that there are those who prefer rural life and if the road to home is unpaved so much the better. Schaeffer himself said "there are classes of people who would prefer a sparsely" developed area in which to build. Nevertheless, he did not think that, "they would prefer to be next to a mound of garbage either. That's — the same class of people looking out to be in a rural area is not going to be looking for a proximity to a landfill." [Rebuttal; 11/10/89 p.m.]
The lack of town water, town sewers and an unpaved road may, as Schaeffer testified, place this lot at a disadvantage. Then again they may not. But regardless of disadvantage, whether they are taken individually or collectively, these circumstances do not prevent the construction of a single-family home on the subject site.
He said that the removal of soil from the southern area "by itself, excludes the site for a single family dwelling" but he gave no reasoned explanation why that is so.
What Schaeffer's testimony does make clear is that the important reason or "the primary consideration," as he put it, for his opinion is the existence of "this rather grotesque hill" or this "350 foot high mound of refuse adjacent to" the southern site. The Court gathers from his testimony that if the mound were a natural feature his testimony might be different. When he was asked about the effect of a "three hundred odd foot tall pile of clean fill" he said, "I think anyone would be suspicious of this mound out in the middle of nowhere. It certainly wouldn't be a natural feature." The Court takes it that even he would not say that any house lot sitting at the foot of a natural hill is rendered unmarketable by being so placed.
It should be pointed out that Schaeffer was looking at Lot 9 as it was on January 13, 1985 and not as it was on July 13, 1983, the date on which the southern site was closed. His reference was to "a closed landfill, a 350 foot mound of refuse." On July 13, 1983, the northern site was neither closed nor was the mound anywhere near the 1985 final elevation of 370 feet. On July 13, 1983, the closure order prevented future landfilling to the south but there was no landfill to close to the south because LRR had never conducted any landfill operation there. Not until January 13, 1985 did the operation come to an end having created a 370 foot mound.
In basing his opinion on the presence of a 350 foot mound of garbage, Schaeffer premised it on a false factual predicate. While it is true that when January 13, 1985 arrived the closed landfill was at its 370 maximum elevation, it was not 370 feet above the southern site as he said repeatedly but 370 feet above sea level. On July 13, 1983 and January 13, 1985, the lowest elevations of the southern site at the point where it was traversed by the power line were respectively the same — 250 feet. (Exhibit 20B) On the date of closure, therefore, viz., on July 13, 1983, it could be foreseen that the highest the landfill mound would be above the southern area was 120 feet. That is a hill one-third as high as the one Schaeffer was talking about. Had he considered the highest point of the southern area — 350 feet — he could have told anyone interested in buying the lot on July 13, 1983 that by January 13, 1985 there would be a 65 foot hill next door — a hill less than one-fifth as high as the one upon which he based his opinion.
Looking at his testimony as favorably as one might, it could be said that it does not matter whether the mound is 65 feet high or 120 feet high. What matters here as far as Schaeffer is concerned is that no one would live next door to a garbage dump. That may be true as an abstract proposition. The plaintiff has failed to prove it to be true in this case.
The Court recognizes that, whatever one chooses to call the operation on July 13, 1983, the plaintiff had been dumping trash, garbage, refuse and a variety of junk and materials north of the swale for years and would continue to do so for another eighteen months. Anyone interested on that day in buying the land south of the swale would be able to see the dumping in progress. In considering, as he has, that such activity renders the balance of the lot useless for residential purposes, Schaeffer ignored the facts that the dumping would be carried out under a State-approved plan; that the plaintiff itself did not anticipate the development of "any serious environmental problems"; that there would be a daily covering of the refuse and that the whole operation would end on January 13, 1985 with the entire mound properly seeded to provide vegetation. (Exhibit 19)
Were he the agent for the buyer on July 13, 1983, he could have provided his client with an artist's renderings showing what the size of the closed landfill was going to look like eighteen months hence and visualize the view of the mound from the southern site from three different perspectives. Much as Exhibits FFF, GGG and HHH and their relationship to the southern area as shown on Exhibit WW have given the Court a view of how the area appeared in 1989, so too the renderings could be utilized by Schaeffer to inform his client on July 13, 1983 that the parcel, in spite of the garbage dumping next door, had a residential use. The renderings would provide graphic evidence for the buyer to foresee that, even if he began to build a house that very day while garbage was being dumped, the time would come when the garbage dump would become a grass covered hill.
Rather than look at the southern site on July 13, 1983 through those eyes, Schaeffer opined, "[I]t's been my experience that people are suspicious of landfills, closed or otherwise, regardless of how glowing the reports may be of the closure and the maintenance of it." [Tr. 630] Yet he cited not a single source that was part of his experience. He left unanswered whether his experience included the fact that such suspicion could or could not be allayed or whether he was saying that people are all so incredulous that no plot of ground next to a closed landfill could ever be marketed for dwelling purposes. Instead, he spoke of such things as "the perception of people in general" in purchasing crops raised next to a landfill and that, "[He] would think purchasing food raised next to a landfill is not a very good idea." Id. He expanded upon the matter with this expansive and unsupported statement: "[T]here is a general perception that landfills are not safe places to be." [Tr. 632]
Rather than restricting himself to those generalizations, which some might say have a facial appeal because they are spoken as an expert in real estate matters, he moved into the territory of a discipline which is foreign to him. He told the Court that a very important reason which prevents the use of the southern property for a residence is the "psychological effect" which the northern site exerts on the southern. He then refined his psychological opinion, saying, "[P]eople are not precise in their perception of what's going on around them day by day." And while conceding that "there are classes of people who would prefer a sparsely" developed area in which to build, he felt it necessary to call upon another discipline to make the anthropological qualification that "the same class of people looking out to be in a rural area is not going to be [the same class of people] looking for a proximity to a landfill." [Rebuttal; 11/10/89 p.m.]
These various reasons, given within and without his field of competence in an effort to sustain the burden of proof, are replete with personal and intuitive feelings and judgments clothed, in some instances, with the garb of experience the content of which he never individualized or articulated. Their lack of factual reference points entitle them to no weight. Leaving aside for the moment other evidence in the case, the Court does not accept this proposition that on July 13, 1983 there could not be a single individual in this State who would be interested in buying this 14 acre parcel at market value to build a dwelling on it. It is not a question whether it is feasible to subdivide the parcel into lots with a reasonable rate of return for the investment. The question is whether the 14 acres may be used for a residence. Such a use is a reasonable and beneficial one. That it can be so used is an answer implicit in the question itself.
Other evidence in the case, at a minimum, offsets Schaeffer's position that land adjacent to a landfill is not marketable. He did not confine his opinion of marketability to an operating landfill but included those which have been closed. He was shown to be wrong by the testimony of Mr. William E. Coyle, Jr. The evidence adduced through Coyle on this issue included the existence of a residential development across the street from the closed Capuano landfill in Cranston. That six single-family dwelling development is depicted in Exhibits WWWW, XXXX, YYYY and ZZZZ. Schaeffer had nothing to say in plaintiff's rebuttal case about the Cranston or any of the other developments testified to by Coyle until the State brought the matter up in cross-examination. This is Schaeffer's response to Coyle's testimony:
 Q You had an opportunity to review Mr. Coyle's testimony, did you not?
 A Yes I have, yes.
 Q And the testimony concerning the Cumberland area, the Coventry area, the Johnston, in which there has been considerable development despite its proximity to dumps, as you say?
 A Well, what's your question? The statement —
 Q You've reviewed that, have you not?
 A I remember his testimony. I don't agree with it. I find that there are landfills closer to this landfill in the northern part of Rhode Island that have no residential development next to it.
 Q And your testimony during — during the summer was that there would be no interest, no interest in the purchase of property in proximity to a dump?
 A To that dump, yes. Bear in mind, Mr. Powers, comparable sales that Mr. Coyle used would have been in direct competition with his site. Some buyer, some developer would have to believe that he can find buyers who would prefer to live next to a closed landfill and to the east of another landfill with reportedly a hazardous waste problem in the subsoil, rather than go to [other developed residential areas in North Smithfield] because Mr. Coyle says that the lots in this particular site, the subject site, would sell for the same amount of money as the lots [in the other areas].
 Q How much do you think we would have to change Mr. Coyle's figures on page 23 [of exhibit YYY]?
 A I think Mr. Coyle would have to conclude that it's not feasible. It wouldn't work. It's not the highest and best use. You wouldn't get to page 23, Mr. Powers. If I got to page 23, after, assume that I do the highest and best use after valuing it, I think the income from sales would probably be twenty-five to thirty thousand total, unless, unless he improved [Oxford Road] to the same degree of quality as you have in [the other areas], at which point he could get something less than they are getting up there, but he would certainly get more than a token price. In either case, it becomes infeasible. If he has to build that road 1800 feet, Mr. Bubly said a hundred thousand [dollars] in his testimony. I have worked on an analysis of 93,000. That wipes out any potential for profit in there to begin with. If he doesn't develop the road, he has to discount the sale prices of those lots so far that he still can't make a profit. So the high — so the final conclusion is it's infeasible and the highest and best use of that site is not for residential development.
 THE COURT: When you say twenty-five to thirty thousand, are you talking about the entire 13 acre parcel?
 THE WITNESS: Yes, your Honor.
 THE COURT: That's what you meant by total, the word total, 25 total?
 THE WITNESS: Yes, your Honor.
 [Rebuttal; 11/10/89 p.m.]
Until this rebuttal evidence, it could be fairly concluded from Schaeffer's testimony in the plaintiff's case in chief that it was his opinion that no one would build a home next to any
landfill. To be sure, his remarks were concentrated on the effect of the landfill on Lot 9 upon the residential use of the southern area of the lot. Had his statements been thus limited, it would permit the conclusion that his opinion pertained to Lot 9 alone and to no other landfill. This would necessitate an explanation why a home could not be built on Lot 9 but could be built next to a landfill elsewhere. But he did not restrict his evidence in that fashion. He said that it had "been my experience that people are suspicious of landfills, closed or otherwise. . . ." [Tr. 630] (Emphasis added.) In a broader vein, as the Court has already quoted above, he ventured that, "* * * If it's a garbage dump, they're not going to build a house next to it." [Tr. 761] The Court determines that the witness' use of this language was meant to include all landfills. To the Court, this language means that no one would build next to a mound of garbage anywhere.
Faced with Coyle's testimony, Schaeffer changed his position in this manner:
 Q And your testimony during — during the summer was that there would be no interest, no interest in the purchase of property in proximity to a dump?
 A To that dump, yes.[***] (Emphasis added.)
It is very apparent that Schaeffer is saying that no one would build a house on Lot 9 but they might build one next to some other landfill. It became convenient for him to say so in order for the plaintiff to contend with what Coyle had presented to the Court. One must wonder what is so special or peculiar about the garbage heap on Lot 9 that is lacking on land next to any other garbage heap that Coyle spoke about. Schaeffer compounded this mystery by giving as an explanation that there are landfills closer to Lot 9 in northern Rhode Island that do not have houses on them. That may well be so but ignores the fact that there are indeed people who are living next to a mound of garbage on Pontiac Avenue. Schaeffer simply failed to provide a rational basis why a family living across the street from the old Capuano dump would turn its nose up at living on Lot 9 — especially since someone inclined to build on Lot 9 had the benefit of locating a home in the country at a much further distance from the base of the LRR mound than the width of Pontiac Avenue and would have its view of the mound screened by trees. Another point made by Schaeffer had to do with Coyle's testimony that the southern area was capable of providing a four lot subdivision. In Schaeffer's view, the sale of those four lots — the entire 14 acres — would produce sales of a total sum of twenty-five to thirty thousand dollars at most. Because the project would be unprofitable — or unfeasible as he put it — "the highest and best use of that site is not for residential development." It is quite obvious here that Schaeffer is talking in terms of profitability and not beneficial use. The unexpressed thought is that the land is worth, according to his earlier testimony, in excess of six million dollars as a landfill site but not more than thirty thousand dollars as it otherwise sat on July 13, 1983. It may well be that the highest and best use of the southern sector would have been as a sanitary landfill had that use not been prohibited by the Zoning Ordinance. In the area of inverse condemnation analysis, the terms "highest and best use" and "reasonable and beneficial use" express different concepts which may or may not be synonymous. Even where a landfill is a legally permitted use, that fact would not prevent the same site from being used beneficially for a single one-family home. For example, if a landfill were permitted in an REA zone, both it and single-family residences would be beneficial uses to the landowner although a landfill might be the highest and best use of the land. Admittedly, there is a dramatic disparity between the two values testified to by Schaeffer but a disparity in values, at least under Annicelli, supra, does not render the residential use unreasonable or lacking in benefit to the owner.
In submitting his opinion that the southern area could not be used beneficially for a residential purpose, Schaeffer came to the Court with many years of experience in appraising real estate. His purpose was to assist the fact finder in resolving the issues raised by the parties. As is to be expected, others similarly placed have come to express themselves on identical issues. With respect to the testimony of all, the Court, while paying deference to the unique knowledge of these special witnesses, owes to the parties to the proceeding the ultimate obligation to ascertain the truth. The Court has already noted aspects of Schaeffer's testimony, absent self-impeachment, which have caused the Court to conclude that his opinions fail to fulfill the evidentiary burden. To those observations are to be added the lack of objectivity expected of an expert witness demonstrable in his unnecessarily repetitive references to the heap of garbage and his magnification of the mound three to five times greater than he knew it was going to be. A witness is entitled to choose whatever words he wishes to express his thought but Schaeffer's recurring pejorative use of the words garbage and refuse was provocative and revealed his bias toward the plaintiff. His testimony was not that of an expert but of an advocate.
Were there no other reason to reject Schaeffer's testimony in this proceeding, the Court would reject it nonetheless because of self-impeaching, contradictory evidence he gave to the Court.
On Friday morning, July 14, 1989, while being cross-examined by the State, Schaeffer testified as follows:
 Q Now, in making your determination as to the consistency of the Wehran proposal, with the zoning requirements on the southerly portion, did you review the zoning of the southerly portion?
 A Yes.
 Q And are you aware that the plaintiff, the plaintiff requested of the Town Council, in 1976, that Lot 9 — excuse me, Lot 9 and lot 9A, be changed to permit the operation of a sanitary landfill?
 A No, I'm unaware of that. [Tr. 689]
At that point, the State had the petition to rezone marked Exhibit Q and the minutes of the Town Council meeting in regard to the petition marked Exhibit R. Schaeffer was asked whether he "had a chance to look over those two documents" while on the witness stand and he answered, "No, I just read the one, the Town Council's petition for a zoning change." Immediately thereafter, he read into the record such portions of Exhibits Q and R as had been selected by the State. [Tr. 693-695] What was left of the morning session of the trial was taken up with his testimony concerning the application of the Zoning Ordinance to the southern portion of Lot 9. The Court then adjourned for the day.
When trial convened on Monday morning, July 17, 1989, and before cross-examination resumed, the witness informed the Court that he had examined over the weekend an analysis he had made the previous Thursday and had found it erroneous. The focus of the subsequent cross-examination until the mid-morning recess was upon factors involving market value. Cross-examination continued in that area after the recess until this testimony was elicited:
 Q And as to, as to zoning sir, for the site, you did no independent analysis of the zoning which might permit uses or restrict the uses to which the property might be put, correct?
 A No, that's not correct, no. I spent a great deal of time working on the zoning in this case.
 Q And you were not aware of the 1976 application for the change in zoning?
 A Oh I was aware of that, yes. I never read it, but I was aware there had been an application. [Tr. 753-754]
His statement that he "was aware there had been an application" filed in 1976 is in direct contradiction to the testimony given the previous Friday to the identical question and was a knowing falsification. If his testimony of the previous Friday had been a mistake, he had a number of opportunities to correct it.
On that Friday, after he said he was not aware of the application, he read it to himself. He then read portions of it and the Town Council minutes aloud. Those readings surely would have triggered his memory then and there so that he could say to the Court that they refreshed his memory and that he was indeed aware that an application had been filed. He had a second chance to change his testimony upon his appearance on Monday in the same fashion as he had noted his error of the prior Thursday. Finally, while under cross-examination on Monday morning, he could have set the record straight in answering this question: "When you first mentioned that to the Court this morning, you indicated that you made some errors during your testimony on Friday. What were those errors, sir?" [Tr. 726] That question invited him to correct any errors he had made in his Friday testimony.
It is the Court's judgment that his testimony on any issue in this case has proved to be of no value to the plaintiff.
C
Peter A. Laudati, Jr. joined in Schaeffer's opinion that the highest and best use of the southern portion of Lot 9 on July 13, 1983 was a sanitary landfill. In his opinion, there was no other beneficial use for that area and in saying so he had considered every use permitted by the Zoning Ordinance. The bases of his opinions were that the location was isolated and remote; that residential use would be kept out by the existence of Oxford Road because it was a one lane dirt road; that there were no significant utilities going up the road and that the heavy power lines to the east were not residentially compatible. He said he could not anticipate any reasonable residential use. Residential use was made unlikely by a small hill or large mound overlooking the southern site.
It was pointed out to Laudati that, two years before his testimony in this case, he had given sworn testimony about the "small hill or large mound." (Exhibit V) In August, 1987, he described the southern site as being "next to a mountainous landfill pile." To his credit, before this Court, he said that the description of the mound was overstated. It was not a mountainous pile, he said, but a moderate hill surrounded by green growth and fit into the surroundings very well. Anyone going by would look upon it as a hill. Here, Laudati is at odds with Schaeffer who thought the hill to be "grotesque" and saw it as a mound of garbage. Nevertheless, because of the site's isolation, the lack of utilities and the road, he would be amazed if the site would be developed residentially. The height of the hill presents a disadvantage and at least in his practice people do not build at the base of a hill. This, too, was a change from earlier testimony that no one likes to build a house at the base of a hill. In testifying that the isolated nature of the southern site, together with the dirt road and the lack of utilities, would render the development of that site virtually nil, his comment was, "I would be scared stiff living alone there at night."
In spite of his saying that he had been at the subject property at least five times, Laudati's testimony reflects scant familiarity with the southern sector. He testified in Exhibit V that the gravel or sand banks in the southern area had been reduced "to the point where, topographically, they may have been close to the water level (if not below)" but admitted that the testimony was purely conjecture because he did not determine the water table level and determined the topography by walking over the land and seeing it. In Exhibit V his opinion was "based in part on the site's location, but especially on its condition as of the time of closure: excavation well below the normal topographical limits of the property, lying closely by a 370 foot high pile of solid waste, which has been capped and pierced by methane recovery wells." He was as wrong about the 370 foot high pile of waste as was Schaeffer. He testified on cross-examination that he did not know the normal topographical limits of the property and, in answer to a question by the Court, stated that he did not know for a fact that the excavation was below normal limits.
Laudati no more satisfied the Court that the 14 acres of Lot 9 could not be used to build a house upon it than did Schaeffer. He stated in Exhibit V that the nature of the subsoil was unsuitable for "dwellings" but he failed to explain there or in Court what it was about the subsoil that would prevent one house on that lot from being serviced by a well and an individual waste system. His testimony amounted to "me too" and he said as much when he stated that he listened to Schaeffer testify from the witness stand and was "in wholehearted agreement with him."
The uninformative characteristics of Laudati's evidence in the plaintiff's case in chief is revealed markedly on a subject about which he has been said to have particular knowledge. To illustrate the point, the Court returns to Schaeffer's initial appearance and the cataloguing of the various permitted zoning uses. Section 5.4.1(2) permitted "Non-commercial raising of animals outdoors." Schaeffer was asked what that meant to him and his response was, "That's usually chickens, maybe a cow, something like that." Schaeffer took no opportunity to say why horses could not be raised on those 14 acres, an activity which might provide the landowner and others with the pleasure of horseback riding even if the landowner had built only stables on the land. Nor did Schaeffer give any reason why horses could not be raised for sale off the site, given the fact that, unless a special exception were granted, the ordinance prohibits commercial animal raising.
Laudati mentioned not a word about raising animals, horses or otherwise. He simply excluded such a use as a beneficial use by his generalization that the only beneficial use is a landfill. It developed, however, that he might have been able to advise the Court on this issue. What he could have said may even have proved the point by a fair preponderance of the evidence.
Laudati was called in rebuttal because the State submitted as part of its case that the 14 acres could be subdivided into four lots. The subdivision, Exhibits YY and ZZ, depicted two of the lots having a horse paddock and a stable. The rebuttal testimony was excluded because it related to matters which Laudati should have presented at his first appearance particularly in light of the fact that he had already stated in 1987 that the land was not suitable for raising animals. (Exhibit V) In urging the reception of his testimony, both by way of rebuttal and by reopening his direct examination, the plaintiff represented that, "Mr. Laudati would testify that he lives on a horse farm. He keeps horses. The power line easements would be a strong negative factor specifically with reference to the use, and he would testify, for that reason, that the development shown on Exhibit YY and ZZ is not feasible or practical." [Rebuttal; 11/8/89 a.m.] From what the plaintiff said in support of admissibility, Laudati was in a special position to assist the Court in deciding whether Lot 9 could be used for the raising of horses. But whether it was to show that horses could not be raised on the 14 acres or that the parcel could not be subdivided, the time for Laudati to have said so was when he first appeared. Laudati was no tenderfoot in the real estate business. He has had more than a quarter century of experience and has testified in more proceedings probably than any other real estate appraiser in this State. This fact is evidence of the respect which he has enjoyed in his professional reputation. But by his wholesale adoption of Schaeffer's testimony, he chose not to inform by specifics. There is no doubt in the mind of the Court that this choice was purposeful.
Since the plaintiff fell short of its burden on this issue, the use permitted by § 5.4.1(2) of the ordinance remains a reasonable and beneficial one.
The undiscriminating nature of the endorsement which Laudati gave to Schaeffer's testimony is exemplified by what Schaeffer said here:
 Q Number 5, [section 5.4.4(5) of the zoning ordinance] "Religious institution"?
 A Again, the proximity of the landfill in the northerly portion, the lack of a paved road, precludes this use. [Tr. 643]
Here Laudati seconds an opinion which ignores the fact that the members of a congregation who come to a house of worship located on Lot 9 would not be living next to the landfill. He seconds an opinion which represents that an unpaved Oxford Road prevents all religious sects, with the means to do so, from buying the 14 acre parcel to provide a building which will serve, more likely than not, only periodic religious meetings. This kind of evidentiary support does absolutely nothing to help the plaintiff carry the burden of persuasion.
The Court finds that the plaintiff has failed to prove that the State's action in closing the southern portion of Lot 9 has caused it to be denied all reasonable and beneficial use of its land. The Court finds that there is affirmative evidence establishing the fact that the plaintiff has derived a reasonable and beneficial use of the land south of the seasonal swale and the power line both before and after July 13, 1983.
IV
After the State rested its case, the plaintiff re-called some of its witnesses to offer rebuttal testimony. As to some of these witnesses, the State objected that the testimony was not being introduced to meet new matter and, hence, did not constitute proper rebuttal. In respect to two witnesses, Laudati and Mr. Mark Berkman, the plaintiff also moved to reopen its case in chief to have their testimony admitted as part of their direct examination. As to all these witnesses, except Laudati, the Court received the testimony subject to its admission or exclusion after the parties had rested and post-trial memoranda had been received. The Court now renders its deferred rulings.
The testimony of Richard Peluso is admitted as rebuttal evidence and plaintiff's Exhibits 92 for identification and 93 for identification are received as full exhibits.
The plaintiff's motion to reopen its case to admit the testimony of Mark Berkman as part of his direct examination is denied. His testimony is admitted as rebuttal evidence. Plaintiff's Exhibits 95 for identification and 96 for identification are received as full exhibits.
In the course of the testimony of Mr. David J. Wilson, the State agreed that two Exhibits, 97 and 98, which concerned his testimony, could be received as full exhibits. The Court admits Wilson's testimony in rebuttal.
The testimony of Mr. Philip Wagner is received as rebuttal evidence.
The testimony of Roy Schaeffer is received as rebuttal evidence. Plaintiff's Exhibit 78 for identification, which was marked while Coyle was being cross-examined, is received as a full exhibit. Plaintiff's Exhibits 99 for identification and 100 for identification are admitted as full exhibits. The admission of Exhibit 101 for identification as a full exhibit is denied.
The plaintiff's motion to admit Laudati's testimony either as part of his direct testimony or as rebuttal is denied.
The defendant's evidence in surrebuttal is admitted.
The record is not satisfactorily clear on the Court's rulings in regard to the State's offer of proof for the admission of the testimony of Mr. Daniel Bubly in surrebuttal relating to the public or private character of Oxford Road. The Court denied the offer. The State later moved the Court to reconsider that ruling. In the event that the record creates doubt about the Court's ruling on the motion to reconsider, the Court denies the motion to reconsider and affirms its prior ruling denying the State's offer of proof.
V
In the course of this decision, the Court has made findings of fact and conclusions of law. The necessary length of this decision renders it prudent that those findings and conclusions be summarized.
The Court finds as facts:
1. That the license granted by the State to the plaintiff for the operation of a sanitary landfill was a license of the entirety of Lot 9 and not restricted to the northerly portion of the lot.
2. That the Zoning Ordinance of the Town of North Smithfield designated the southern area of Lot 9 as an REA zoning use district.
3. That the Zoning Ordinance of the Town of North Smithfield prohibited land in an REA zone to be used for a sanitary landfill operation.
4. That the southern area of Lot 9 was not relieved of the prohibition against use as a sanitary landfill by a pre-existing legal non-conforming use.
5. That the southern area of Lot 9 was not relieved of the prohibition against use as a sanitary landfill by the grant of a special exception or variance.
6. That the defendant is not estopped from requiring the plaintiff to prove the existence of a legal non-conforming use or the grant of a special exception or variance.
7. That the defendant is not estopped from claiming that the plaintiff enjoyed a reasonable and beneficial use of its land by the extraction of soil from the southern area and its use as daily and final cover material throughout the life of the landfilling operation conducted on the northern area of Lot 9.
8. That the plaintiff derived a reasonable and beneficial use of its land by the extraction of soil from the southern area and its use as daily and final cover material throughout the life of the landfilling operation conducted on the northern area of Lot 9.
9. That the plaintiff failed to prove that the southern area of Lot 9 could not be reasonably and beneficially used for any use permitted in an REA zone by the Zoning Ordinance of the Town of North Smithfield.
The Court's conclusions are:
1. That the closure order of July 13, 1983 did not constitute a taking by the defendant of the plaintiff's land by inverse condemnation.
2. That any deprivation of the use of the plaintiff's land as a sanitary landfill resulted from the provisions of the Zoning Ordinance of the Town of North Smithfield and not as a result of the closure order of July 13, 1983.
3. That the closure order of July 13, 1983 did not deprive the plaintiff from any reasonable or beneficial use of its land.
4. That the plaintiff is not entitled to any compensation from the defendant as a result of the defendant's closure of Lot 9 as a sanitary landfill.
The plaintiff's complaint is denied and dismissed. Judgment may enter for the defendant for costs.